Joseph Victor **CUSUMANO** and Sidney M. Harmon, Appellants-Plaintiffs,

v.

Dr. C. Brice **RATCHFORD** et al., Appellees-Defendants.

No. 74–1381.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1974.

Decided Dec. 17, 1974.

Rehearing and Rehearing En Banc Denied Jan. 24, 1975.

Lieberman, Baron & Goldstein, University City, Mo., for appellants-plaintiffs.

James S. Newberry, Columbia, Mo., for appellees-defendants.

Before LAY and WEBSTER, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The controversy before us concerns yet another aspect of the relationships between educational institutions and their teachers.[1] Here the problem centers around the school's failure to reappoint probationary teachers and the rights of the disappointed teachers with respect thereto.

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

The plaintiffs before us are two teachers. The defendants are administrative officers of the University of Missouri and the members of its Board of Curators (hereinafter, collectively, the University). The Complaint states that plaintiff Cusumano was employed in September of 1964, under a term appointment for one year as an instructor of engineering mechanics at the University of Missouri-Rolla, Rolla, Missouri. At or about this time he received a copy of the Academic Tenure Regulations of the University (Regulations) to which reference will hereinafter be made. He subsequently received one-year contracts on September 1st of each year through and including the school year 1970–1971. On March 31, 1971 he was notified that he would be appointed to a terminal one-year term for the school year 1971–1972 but would not be rehired thereafter.

Plaintiff Harmon was employed in September of 1968 as an associate professor of mathematics at Rolla, also receiving at such time the University's Academic Tenure Regulations. He was rehired from year to year on term appointments through and including the school year 1970–1971. In December of 1970 he was notified that his appointment for the school year 1971–1972 was a terminal appointment and that he would not be hired thereafter.

In view of the fact that both teachers were on "term appointments" as opposed to continuous or tenure appointments, neither was given reasons for his non-reappointment, the University relying upon its Regulation specifically so stating:

> [I]t shall not be necessary for his [the term appointee's] dean or department chairman to provide him with any statement of causes or reasons for not recommending reappointment.[2]

Subsequent to the commencement of a prior related action plaintiffs were given

---

1. See compendium cited in Frazier v. Curators of University of Missouri, 495 F.2d 1149, 1150 n.1 (8th Cir. 1974).

2. Regulations, Section 4F.

a hearing,[3] but they assert that it was fruitless since the hearing produced no reasons for nonreappointment. Apparently plaintiffs sought to utilize this hearing as a forum to establish their academic credentials, since they complain to us that at the hearing they "could not defend against charges concerning their professional competency because they were never informed of those charges." (Competency is not the issue presented to us, however, though it is pled as a part of the inducement.)

What is presented is the claim that plaintiffs' constitutional rights to due process under the Fourteenth Amendment were violated by the University's refusal to give them reasons for their nonreappointment with an adequate hearing thereon. They seek damages, back pay, declaratory relief and an order requiring the University to reinstate them with "tenure or continuous employment."[4] Ordinarily, under the teachings of Perry v. Sindermann, 408

U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), a probationary teacher has an insufficient "property interest" in the continuation of his employment past the expiration of his contract to invoke due process protections concerning the decision not to reappoint him. In this case, however, plaintiffs assert in substance that under their contracts and in the circumstances before us they have acquired a "*de facto* tenure"[5] entitling them to such protection. The court below found otherwise and dismissed the action. We agree.

The issue presented concerns the proper interpretation of the University's Regulations which, it is conceded by both parties, are incorporated by reference in the contracts of the plaintiffs. The University of Missouri, in the year 1950, promulgated extensive and specific Academic Tenure Regulations establishing a tenure system for all academic employees of

---

**3.** The plaintiffs' original lawsuit was dismissed without prejudice, the court noting in its Memorandum and Order of October 4, 1972 that:

Although the complaint makes no reference thereto, it is not disputed that after the Tenure Committee of the University had heard and considered the respective cases of plaintiffs and submitted a majority and minority report with respect thereto, both plaintiffs appealed their non-retention to the Board of Curators (over a month before this suit was filed) and that said appeals were referred by the President of the Board to its Academic Affairs Committee. Thereafter, both plaintiffs through their attorney requested an opportunity to appear before the Committee and present oral arguments by themselves and by their counsel and such opportunity was afforded them, although for various reasons, one of which was related to the convenience of their counsel, the requested hearing has not yet been held. It is now scheduled for October 12, 1972. In this situation * * * the procedural due process claim is premature.

The hearing subsequently held was not to plaintiffs' satisfaction, and they brought this second action against the University.

**4.** Plaintiffs' prayers for relief ask:

That the Court issue a permanent injunction enjoining Defendants from refusing to honor that portion of the Regulations by which Plaintiff is entitled to tenure or continuous employment.

*Cf.* Machlup, In Defense of Tenure, in Academic Freedom & Tenure: A Handbook of the American Association of University Professors 306, 310 (L. Joughin ed. 1967) [hereinafter cited as Machlup]:

No self-explanatory adjective * * * is available to abbreviate the phrase "tenure until retirement or removal for adequate cause," which is the meaning of academic tenure in the United States. The adjectives actually used are "permanent," "continuous," or "indefinite."

**5.** Perry v. Sindermann, 408 U.S. 593, 600, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing" *Id.* at 601, 92 S.Ct. at 2699. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

the University. Two types of appointments are specified, term appointments and continuous appointments.[6] Only holders of the latter type of appointment have permanent or continuous tenure. Term appointees have no rights thereto although their appointments cannot lawfully be terminated during the term, save "for cause."[7]

Considering the plaintiffs in turn, Mr. Cusumano was, under his contract, an instructor. The regulations concerning the termination of his service are found in Regulations, Section 4A:

> *Instructor.* Initial appointment at the rank of Instructor shall be a term appointment for one academic year. The maximum probationary period on term appointments shall not exceed seven years. During the appointee's initial one year term, and during each succeeding term through his seventh year of service, his dean or other appropriate administrative officer shall make one of the following recommendations * * *:
>
> [(1)–(5) list retention alternatives.]
>
> (6) that he be reappointed Instructor for a terminal one year term, expressly stated to be such; or
>
> (7) that he not be reappointed, provided there has been timely notice as stipulated in Section 4E. A formal recommendation to this effect need not be made.

With respect to Associate Professor Harmon the pertinent termination regulations are found in Section 4C:

> *Associate Professor.* Initial appointment at the rank of Associate Professor normally shall be a term appointment. The maximum probationary period on term appointments shall not exceed four years. During the appointee's initial term, and during each succeeding term through his fourth year of service, his dean or other appropriate administrative officer shall take one of the following recommendations * * *:
>
> [(1)–(3) list retention alternatives.]
>
> (4) that he be reappointed Associate Professor for a terminal one year term, expressly stated to be such; or
>
> (5) that he not be reappointed, provided there has been timely notice as stipulated in Section 4E. A formal recommendation to this effect need not be made.

The notice provisions in event of nonreappointment are found in Section 4E of the Regulations and provide, substantially, that notice of not less than one year shall be given to those in the categories of these plaintiffs, but that appointment for a "terminal one year term * * * expressly stated to be such" (one of the University's options "during each succeeding term") "shall be sufficient notice that the appointee will not

---

**6.** Regulations, Section 2 provides:

*Types of Appointments.*

A. There shall be two types of appointments to academic staff positions, term appointments and continuous appointments.

B. Term appointments begin at a specified date and terminate at a specified date. Term appointments usually are for a period of one academic year, but may be for a longer or shorter period.

C. Continuous appointments begin at specified date but have no specified date of termination.

\* \* \* \* \* \*

**7.** Regulations, Section 3 provides:

*Tenure.*

A. Holders of academic staff positions under continuous appointments shall have permanent or continuous tenure, subject to termination only for cause, for retirement for age in accordance with Board retirement regulations, or under extraordinary circumstances because of financial exigencies. Due consideration shall be given to seniority in terms of academic rank and length of service in the event certain continuous appointments must be terminated because of financial exigencies.

B. Holders of academic staff positions under term appointments shall have no rights of permanent or continuous tenure. Their appointments shall not be terminated during the term thereof except for cause, or under extraordinary circumstances because of financial exigencies.

\* \* \* \* \* \*

be recommended for reappointment at the end of the terminal period."[8] As noted, such notice need not include a statement of reasons for the nonreappointment.[9]

The above Regulations as to termination of employment bear directly upon plaintiffs' basic argument, namely, that "during the period of their employment they acquired a protectable property interest in their jobs" under the teachings of *Roth* and *Sindermann, supra.* This property interest, we are told, arose from "the expectancy of reemployment that is fully explained in the *Roth* and *Sinderman* [sic] cases." In view of the fact that the Regulations above quoted (Sections 4A(6), 4C(4) and 4E) clearly state that during any year of a term appointee's probationary period[10] he may be subject to what amounts to a notification of discharge by appointment to a terminal one year term, and that such notifications actually were given to the plaintiffs on, respectively, December 22, 1970 (Harmon) and March 31, 1971 (Cusumano) specifying a terminal academic year ending over a year hence, we are unable to find any reasonable expectancy of reemployment under the teachings

of *Roth* and *Sindermann.* The entire thrust of the tenure Regulations is to avoid the *de facto* tenure hypothesized in *Sindermann, supra,* 408 U.S. at 602, 92 S.Ct. at 2700, amounting to "an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure." Peculiarly applicable to the *de facto* tenure doctrine is Section 3B of the Regulations which states that "Holders of academic staff positions under term appointments shall have no rights of permanent or continuous tenure."

But plaintiffs would avoid the provisions of the Regulations above cited by reliance upon Section 2 of the 1940 Statement of Principles adopted by the University and attached as an appendix to the Regulations. This 1940 Statement of Principles, we note at this point, has as its stated purpose "to promote public understanding and support of academic freedom and tenure and agreement upon procedures to assure them in colleges and universities." Its origins, and the "status" of the principles enunciated are described by Machlup[11] thus:

There was first the 1915 Declaration of Principles, formulated by a commit-

---

8. Regulations, Section 4E provides:

*Notice that reappointment will not be recommended.* An appointee who is not to be recommended for reappointment at the end of any term of appointment shall be notified in writing to that effect by his dean or other appropriate administrative officer. Notice of not less than one year shall be given to the following persons: (1) an Instructor who has completed at least three years of service; (2) an Assistant Professor who has completed at least two years of service; and (3) an Associate Professor or Professor who has completed his initial term appointment. In all other cases notice of not less than six months shall be given, i. e., in the usual case of a term appointment for the regular academic year, the notice shall be given prior to March 1.

A terminal one year term appointment expressly stated to be such shall be sufficient notice that the appointee will not be recommended for reappointment at the end of the terminal period.

\*    \*    \*    \*    \*    \*

9. Regulations, Section 4F provides:

*Statement of reasons for not recommending reappointment.* The non-reappointment of any appointee on term appointment shall carry no implication that either his work or his conduct has been unsatisfactory. For this reason it shall not be necessary for his dean or department chairman to provide him with any statement of causes or reasons for not recommending reappointment. [Footnote omitted.]

10. The school year 1970–71 was for each plaintiff the last year of his probationary period. Regulations, Sections 4A & 4C. It was Mr. Cusumano's seventh year as an instructor and Mr. Harmon's third year as an associate professor. Under Section 5C of the Regulations, one year of Mr. Harmon's prior service was credited towards his four year maximum probationary period.

11. Machlup, *supra* note 4, at 307 n. 4.

tee of the AAUP.[A] This was superseded by the 1925 Conference Statement, approved by both the AAC[B] and the AAUP. Subsequently, after prolonged discussions over a period of six years begun in 1934, the two organizations agreed on the 1940 Statement of Principles, which is still "on the books" and has been endorsed by 24 [42 in 1967] professional and learned societies. The principles enunciated in the 1940 Statement have the status of "norms," not merely guidelines—although, of course, they are not norms that could be enforced against those who do not observe them, but merely norms by which the profession can judge academic practices which have become the subject of complaints. [Footnotes added.]

A. American Association of University Professors.

B. Association of American Colleges.

The above-mentioned Section 2, relied upon by plaintiffs, states in part that "Notices should be given at least one year prior to the expiration of the probationary period, if the teacher is not to be continued in service after the expiration of that period."[12] Plaintiffs would read "should" in the quoted sentence as "must" and conclude therefrom that since notices were not given (as they "must" have been) during "the penultimate year of their maximum probationary periods in the School year 1969–1970" they had "a property right: the expectancy of reemployment that is fully explained in the *Roth* and *Sinderman* [sic] cases."

Our problem, of course, is to determine the effect to be given the language of the Statement of Principles, precatory on its face, when the *Statement* has been adopted as part of a teacher's contract. The Statement of Principles, it is clear, was not intended by its promulgators to be a binding legal document. The procedures of the disputed Section 2 are stated to represent "acceptable," not obligatory, "academic practice." The "precise terms and conditions of every appointment," it states, should be reduced to writing—words of admonition contemplating transition from the generalities of the *Principles* to the precision of a contract. The function of the *Principles*, it has been said, is to serve as "merely norms by which the profession can judge academic practices which have become the subject of complaints."[13]

The notification provision itself has as a principal and desirable purpose that of an economic shield: according a probationary teacher reasonable warning of impending cessation of employment with

---

12. The context of this quotation from the 1940 Statement of Principles is as follows:

*Academic Tenure*

(a) After the expiration of a probationary period teachers or investigators should have permanent or continuous tenure, and their services should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

In the interpretation of this principle it is understood that the following represents acceptable academic practice.

(1) The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.

(2) Beginning with appointment to the rank of full-time instructor or a higher rank, the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the proviso that when, after a term of probationary service of more than three years in one or more institutions, a teacher is called to another institution it may be agreed in writing that his new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years. *Notices should be given at least one year prior to the expiration of the probationary period, if the teacher is not to be continued in service after the expiration of that period.* [Emphasis added.]

13. Machlup, *supra* note 4, at 307 n. 4: "The principles could [not] be enforced against those who do not observe them, but [are] merely norms by which the profession can judge academic practices which have become the subject of complaints."

its attendant professional and financial dislocations and adjustments.[14] We find no vulnerability of the University on this score. The plaintiffs, in each instance, received over a year's warning prior to their separation from the payroll.

But another consideration, as well, forces itself upon us. In addition to the types of tenure now existing, characterized by one writer in the field[15] as "tenure by law," "tenure by contract," "tenure by moral commitment under a widely accepted academic code" and "tenure by courtesy, kindness, timidity or inertia;" we are asked to sanction another: tenure by default. This is clear from the arguments advanced by plaintiffs in support of their position, namely, that such "continuous employment" arises from the University's alleged failure to comply with the "mandatory" terms of the 1940 Statement of Principles. They argue that any teacher has "an absolute right to rely on the fact that if he were not notified to the contrary at least one year prior to the end of his maximum probationary period as set forth, he would be continued in service under a continuous employment contract." This, in fact, is the basis for plaintiffs prayer for injunctive relief, that due to a lack of notice in the 1969–70 school year they are "entitled to tenure or continuous employment."

We find nothing in the 1940 Statement of Principles warranting a conclusion so drastic. It cannot serve the public welfare or promote the best interests of either the University or its professorial staff to have a body of teachers, whatever their number, the permanent tenures of whom rest upon administrative neglect or oversight as to notice of termination.

Section 2 of the Statement of Principles, we conclude, is not mandatory, it is not inconsistent with the University's Regulations, and furnishes no support

14. Such considerations are stressed in AAUP, Advisory Letter Number One, 48 AAUP Bull. 394 (1962), in Academic Freedom & Tenure: A Handbook of the American Association of University Professors 121–3 (L. Joughin ed. 1967) which states in part as follows:

> *The Year's Notice Rule—Its History.* Of the several rules which protect the teacher in his sought for or achieved tenure status, one of the most important is the provision that he shall receive a year's notice if he is not being reappointed (applicable to nontenure status teachers), or if he is dismissed (tenure status teachers). The need for such a rule has been seen from the beginning of the American Association of University Professors in 1915 to the present moment * * *.
>
> The first major policy statement by this Association, the 1915 Declaration of Principles, stated that "No university teacher of any rank should, except in cases of grave moral delinquency, receive notice of dismissal or of refusal of reappointment later than three months before the close of any academic year, and in the case of teachers above the grade of instructor, one year's notice should be given." Ten years later there emerged from a conference called the American Council on Education a statement which was endorsed by the Association of American Colleges and by this Association. The 1925 Conference Statement eliminated the consideration of rank and tied the notice principle to tenure. It said: "Dismissal for reasons other than immorality or trea-

son should not ordinarily take effect in less than a year from the time the decision is reached." Fifteen years later, the 1940 Statement of Principles, likewise endorsed by the Association of American Colleges and this Association, extended the right to a year's notice to all. It said: "Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period. . . Teachers on continuous appointment who are dismissed for reasons not involving moral turpitude should receive their salaries for at least a year from the date of notification whether or not they are continued in their duties at the institution." (Since the one-year provision places the burden of an unrealistic procedure upon an institution at the beginning of its acquaintance with a teacher, Committee A of the Association in its 1957 Recommended Institutional Regulations authorized the Washington Office to relax the requirement to this extent: during the first year of a teacher's service, notice is adequate if given by March 1; during the second year of service, notice should be given six months before the end of the academic year.)

> *The Year's Notice Rule in Practice.*
>
> * * * * * *
>
> * * * [N]o one can object to a year's notice for a professional man who has been busy doing his work and has had no time to arrange for next year.

15. *Machlup, supra* note 4, at 311.

for plaintiffs' assertions of *de facto* tenure.[16]

It seems appropriate to express a caveat: We do not, obviously, hesitate to enter the burgeoning school-teacher fray when constitutional issues are at stake. So much should be abundantly clear from the compendium cited in note 1, *supra*. But aside from such issues, the matters of the selection of teachers, their professional qualifications, and their retention are best (and, as a matter of law, properly) left to those entrusted by the state with the awesome responsibilities for the education of our young.[17]

We find that the probationary teachers before us had acquired no tenure, *de facto* or otherwise, in the circumstances presented, and that they had no constitutional or contractual rights to a statement of reasons for nonreappointment or a hearing thereon. Frazier v. Curators of University of Missouri, 495 F.2d 1149 (8th Cir. 1974).

Affirmed.

---

16. We will note, merely for completion of analysis, that it is far from clear that the clause was violated, even if mandatory. The Section 2 notice in the Statement of Principles applies only if the teacher is not to be "continued in service" at the end of his probationary period. Here there was an actual continuation in service under a term appointment ("begin at a specified date and terminate at a specified date," Regulations, Section 2B), albeit the appointment was terminal.

17. *See* Greene v. Howard University, 271 F.Supp. 609, 615 (D.D.C.1967) rev'd in part, 134 U.S.App.D.C. 81, 412 F.2d 1128 (1969), quoted in Frazier v. Curators of University of Missouri, 495 F.2d 1149, 1153 (8th Cir. 1974); Jones v. Hopper, 410 F.2d 1323, 1329 (10th Cir. 1969).