Dr. S. Simpson GRAY,
Plaintiff-Appellant,

v.

BOARD OF HIGHER EDUCATION,
CITY OF NEW YORK, et al.,
Defendants-Appellees.

No. 1236, Docket 82–7135.

United States Court of Appeals,
Second Circuit.

Argued May 28, 1982.

Decided Nov. 15, 1982.

Opinion on Rehearing Jan. 25, 1983.

S. Simpson Gray, Law Clinics of Mott & Gray, P.C., Mount Vernon, N.Y., pro se.

June A. Witterschein, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel, Leonard Koerner, David B. Rigney, Jack Muraskin, New York City, of counsel), for defendant-appellee Board of Higher Educ.

Sandra G. Bryan, Washington, D.C. (Michael J. Connolly, Gen. Counsel, Philip B. Sklover, Vincent Blackwood, Washington, D.C., of counsel), for amicus curiae E.E.O.C.

Floyd Abrams, Cahill, Gordon & Reindel, New York City (Peter Leight, New York City, of counsel), for amici curiae Trustees of Columbia University in the City of New York, The President and Fellows of Harvard College, Pace University, and the Trustees of Princeton University.

David M. Rabban, Washington, D.C., for amicus curiae American Ass'n of University Professors.

Before MOORE, FRIENDLY and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Dr. S. Simpson Gray appeals from an interlocutory order denying him compelled discovery in a civil rights action alleging racial discrimination, brought under 42 U.S.C. §§ 1981, 1983 and 1985.[1] Dr. Gray taught for five years in the City University of New York system, always at the rank of Instructor. He seeks at this stage to dis-

---

1. This is the second appeal in this action. On May 7, 1979, this court reinstated the complaint after the district court had dismissed the action without prejudice because it presented no ripe case or controversy warranting federal jurisdiction.

cover the vote of two of the named defendants on his unsuccessful applications for promotion and for reappointment with tenure for the 1979–80 academic year. Furthermore, Dr. Gray "made clear during oral argument on the motion for certification [that] he regards the question of how these individuals voted as only the opening wedge, to be followed by the factors motivating them."[2] The United States District Court for the Southern District of New York, Lawrence W. Pierce, Judge, held that the confidentiality of the faculty peer review system should be protected. *Gray v. Board of Higher Education, City of New York,* 92 F.R.D. 87 (S.D.N.Y.1981). The court recognized a qualified privilege for tenure committee votes because confidentiality is integrally related to safeguarding academic freedom, a value of constitutional significance. We have received briefs of the parties and amici curiae setting forth a spectrum of views on the important issues raised by Dr. Gray's motion to compel discovery. We adopt the balancing approach of the district court. Because we weigh the balance differently on the facts in the particular case before us, however, we reverse.

## FACTS

Dr. Gray, a black educator, was employed at LaGuardia Community College in September 1974 at the Instructor level. Because he held a Master's in Business Administration, plaintiff requested a higher rank at the time of his appointment; this was denied by his superior, defendant Professor Demetriou, on the grounds that all persons entered LaGuardia at the instructor level but were able to advance after their first year of teaching to the rank of Assistant Professor.

The first year, Dr. Gray received a satisfactory college level performance rating based on peer observations and evaluations and an excellent student evaluation. He was, however, not advanced. In his second academic year, his peer observation and

evaluation by defendant Dr. Muelig was reported as unsatisfactory. Consequently, the President of LaGuardia, defendant Dr. Shenker, wrote Gray that his third year reappointment would be conditional. Dr. Gray first filed a written rebuttal of the unsatisfactory evaluation as unfounded and racially motivated, and later filed a grievance, resulting in a rescission of the letter and an unconditional reappointment.

At the end of Gray's second year at LaGuardia, his request for promotion to the rank of Assistant Professor was denied by defendant Dr. Rose Palmer, then Chairman of the LaGuardia Business Division. Gray maintains that he continued to receive excellent student evaluations and that he worked for the success of several College programs and activities, in particular the Teaching Application and Reinforcement Program (TAR). During Gray's third year at LaGuardia, the 1976–77 academic year, he again sought promotion to the rank of Assistant Professor, but, allegedly, the Chairman of the newly established Accounting-Managerial Studies Department, defendant Dr. Miller, advised that it was not a good time for Gray to apply because ill-will had been expressed by some of the Personnel and Budget Committee members and administrative staff. At the start of Gray's fourth year at LaGuardia, 1977–78, he was removed as Chairman of the TAR Program Departmental Committee, a position he had held since 1974. He alleges that defendant Dr. Moed caused his removal.

During the academic year 1978–79, the college advised Gray that he would be considered for the Certificate of Continuous Employment (CCE), the tenure equivalent for instructors. In addition to four years' teaching experience at LaGuardia, Gray by then held a Juris Doctor degree as well as his M.B.A. He again applied for but was denied a promotion to Assistant Professor. Gray contends that he requested a state-

**2.** *Gray v. Board of Education,* 79 Civ. 62–CSH, Memorandum Opinion and Order 4–5 (S.D.N.Y. Dec. 14, 1981). Because these other issues are

not presented for review by this action, we do not decide the discoverability here, and limit our holding to the votes of Miller and Moed.

ment of reasons and that none was given.[3] He alleges that several other departmental faculty members lacking his credentials were given the rank of Assistant Professor. Plaintiff filed an appeal based on his promotional denial by the college-wide Personnel and Budget (P & B) Committee. Defendant Mary E. Ryan, Director of Personnel, denied this appeal.

Both a departmental and college-wide P & B Committee voted on Gray's request for promotion and for reappointment. He received a favorable 3–2 vote from his department, but the college-wide P & B Committee rejected his application. The present motion to compel discovery is addressed to defendants Moed and Miller, who served on the latter committee. Dr. Miller also served as Chairman of Gray's department. Gray seeks to discover their votes and presumably discussions in connection therewith and argues that this evidence is material and indispensable to his case. Miller and Moed refused to answer questions and cross-moved for a protective order on the grounds that their secret votes, as well as the discussions surrounding the vote, were "privileged under both a First Amendment qualified academic privilege, and under the contract between the Professional Staff Congress and the Board of Higher Education."

Judge Pierce analyzed the issue presented by Gray's motion to compel discovery as follows:

Any finding that information is protected from discovery must reflect a balancing between, on the one hand, the parties' right to discovery, which stems from society's interest in a full and fair adjudication of the issues involved in litigation and, on the other hand, the existence of a societal interest in protecting the confidentiality of certain disclosures made within the context of certain relationships of acknowledged social value.

92 F.R.D. at 90. In weighing the side of the balance that would permit discovery, the court acknowledged that "the protection of the constitutional rights of individual litigants is of serious concern to society," *id.* at 93, but believed that in this non-criminal investigation, the information Gray sought was available from other sources and was not clearly relevant. Considering the other side of the balance, the district court stated that "maintenance of the confidentiality of the decision-making process is generally an integral element of a peer review system for granting or withholding tenure," and that "[t]he tenure system is an essential linchpin in the commitment to safeguard the academic freedom of individual teachers." *Id.* at 92 (citing *McKillop v. Regents of the University of California,* 386 F.Supp. 1270, 1276 (N.D.Cal.1975); Note, *Preventing Unnecessary Intrusions on University Autonomy: A Proposed Academic Freedom Privilege,* 69 Calif.L.Rev. 1538, 1551–52 (1981)). The Supreme Court has, of course, characterized academic freedom as "a special concern of the First Amendment." *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

Thus, the district court concluded that the defendants' position met the threshold conditions necessary to establish a privilege against disclosure, finding

that the preservation of the confidentiality of voting with regard to tenure decisions is of value to society; that the communications made during such decisionmaking were made in reliance on the expectation that they would not be disclosed; that the element of confidentiality is necessary to the promotion of professional and harmonious relationships between the parties; and that the relationship is one which ought to be fostered.

---

**3.** The contract-collective bargaining agreement between the Professional Staff Congress and the Board of Higher Education incorporates City University's long-standing policy of confidentiality in Personnel and Budget (P&B) Committee meetings where reappointment and ten-ure decisions are made by secret ballot. The formal Board of Higher Education policy states in part: "On balance, we have decided to recommend against ever assigning reasons for non-reappointment or non-promotion."

92 F.R.D. at 93. The district court held that these considerations and the potential effects of ordering disclosure outweighed the benefit to be gained by the individual litigant's discovery of testimony to support his claim that he had been denied employment for discriminatory, not academic, reasons, in violation of his constitutional rights. *Id.* at 94.[4]

## DISCUSSION

The spectrum of views presented by the briefs in this case ranges from that of the Equal Employment Opportunity Commission (EEOC) ("The approach taken by the district court in restricting discovery in this case . . . would virtually foreclose proof of intentional discrimination in university promotion and tenure cases . . . ." Brief at 2) to that of private universities as *amici* ("Compelling disclosure of tenure votes and confidential peer evaluations imposes significant state burdens on the university's academic freedom 'to determine for itself who may teach' . . . ." Brief of the Trustees of Columbia University et al. at 4). And of course the parties themselves take diametrically opposite views on the issue of privilege, qualified or otherwise.[5]

In resolving the tensions between the opposed needs of disclosure and confidentiality we are reminded that the discovery rules are to be accorded broad and liberal treatment, particularly where proof of intent is required. *Herbert v. Lando,* 441 U.S. 153, 170–75, 99 S.Ct. 1635, 1645–48, 60 L.Ed.2d 115 (1979). To sustain a privilege there must be "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). While we have the flexibility to adopt rules of privilege on a case-by-case basis, *id.* at 47, 100 S.Ct. at 910; *United States v. Gillock,* 445 U.S. 360, 367, 100 S.Ct. 1185, 1190, 63 L.Ed.2d 454 (1980); Fed.R.Evid. 501, we believe a cautious approach preferable. While we will not adopt such a rule here, we do not decline to do so because the party claiming privilege has failed to show a "compelling justification" for it, as held in *In re Dinnan,* 661 F.2d 426, 430 (11th Cir. 1981), *cert. denied, sub nom. Dinnan v. Blaubergs,* —— U.S. ——, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982).[6] Rather we prefer

4. The district court also denied the plaintiff's motion "as a matter of the Court's discretion to limit and control discovery." 92 F.R.D. at 94. The court's discussion, however, refers only to the issues raised by the qualified privilege claim and advances no reasons for the application of its discretion to control discovery. Because it is an unsupported alternative ground of decision, the order below cannot rest on the court's use of its discretionary powers, and we need not, indeed without more we cannot, decide the legitimacy of that basis for the order.

5. In opposing Dr. Gray's motion to compel discovery, the Board of Education argues that New York State law would recognize the academic freedom privilege asserted in this case. True, the New York State Court of Appeals upheld the City University policy of confidentiality in P&B committee meetings, finding that an arbitrator properly refused to direct a committee member to disclose confidential discussion concerning a promotion. *In Re Professional Staff Congress/City University of New York v. Board of Higher Education of the City of New York,* 39 N.Y.2d 319, 324, 347 N.E.2d 918, 383 N.Y.S.2d 592 (1976). The holding, however, was limited to an arbitration proceeding pursuant to the collective bargaining agreement, which specifically incorporates the confi-

dentiality policy. It is not binding on courts weighing the proper scope of compelled disclosure.

Further, we note that the *policy* is nowhere mandated by the state's education *law.* Indeed, inasmuch as the policy may bar an employee's access to proof of discrimination, its guidance runs counter to the legislature's recognition of "the imperative need for affirmative action and the positive desire to have city university personnel reflect the diverse communities which comprise the people of the city and state of New York. In its urban environment this *commitment should be evident in all the guidelines* established by the board of trustees," specifically including hiring. N.Y. Educ.Law § 6201(5) (McKinney 1981–82 Supp.) (emphasis added).

6. In *Dinnan,* an employment discrimination suit, the Eleventh Circuit, Thomas A. Clark, J., rejected as not "even slightly persuasive" arguments that a qualified privilege is necessary to protect societal interests in academic freedom and a secret ballot, 661 F.2d at 430. The court compelled discovery of a faculty tenure committee member's vote. While we have no occasion to agree or disagree with the result in *Dinnan,* we think the opinion accords too little

the balancing approach taken by the district court, 92 F.R.D. at 90;[7] we simply strike the balance in this case differently.

The district court minimized the importance of the appellants' discovery needs in connection with the votes of P & B Committee members because it was "not clear" how knowing the votes themselves could aid Dr. Gray's case. Closer examination of the elements of Gray's case, however, makes Gray's need for the votes transparently evident. Were this a Title VII suit, 42 U.S.C. § 2000e–2(a), our task would be somewhat simpler in the light of the holdings in *Lieberman v. Gant*, 630 F.2d 60, 63 (2d Cir. 1980), and *Guardians Association of New York City Police Department, Inc. v. Civil Service Commission*, 633 F.2d 232, 245–46 (1980), *cert. granted*, 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), that direct proof of discriminatory intent is not necessary. But the Supreme Court has now decided that a finding of intent is necessary in suits like this one under 42 U.S.C. § 1981, *General Building Contractors Association, Inc. v. Pennsylvania*, —— U.S. ——, 102 S.Ct. 3141, 3146–50, 73 L.Ed.2d 835 (1982), and thereby resolved the conflict of authority in the circuits on the point, upholding our circuit's decision that discriminatory impact alone is insufficient proof under § 1981. *Guardians Association*, 633 F.2d at 263–68. Moreover, to establish his Fourteenth Amendment claim that his civil rights were denied, Dr. Gray must show that the discrimination he suffered was intentional. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *see, e.g., Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1977).

But Dr. Gray has not been told defendants' votes, much less been given reasons for the committee's decision. Dr. Gray might prove LaGuardia's intent to discriminate if he could establish that Miller or Moed harbored a racial animus against him and that this was manifested in votes against his reappointment and tenure—but to begin with he would, of course, have to know the votes. Or, he could establish that the reasons given by the P & B Committee for its actions were pretexts for its refusal to rehire and tenure him—if the committee had given reasons.[8] Once Gray has established a prima facie case, the burden shifts to defendants, note 8 *supra*, to articulate with reasonable specificity the reasons for the denial of tenure and to produce some evidence in support thereof. If defendants fail to do so the court will be required to enter judgment for Gray. If they discharge that burden, the burden will shift back to Gray to prove discrimination either directly (i.e., by persuading the court that a discriminatory reason more likely than not motivated the defendants) or indirectly (i.e., by showing that the proffered nondiscriminatory reason is mere pretext). At that point Gray's need for disclosure may turn on the nature of the reason or reasons put forth by defendants. If the defendants claim that the tenure denial was based on evaluations of Gray's performance discussed at the P & B meeting, then certainly Gray will be hamstrung if denied disclosure. If, in contrast, defendants claim that Gray was denied tenure, say, because of poor student evaluations, a record of tardiness and missed classes, or failure to meet a requirement of publication, then disclosure may not be necessary, for if these reasons were pretextual that can be proven without it.

---

weight to the concerns for confidentiality in the academic tenure decision-making process.

**7.** *See also Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir.1981); *Rosario v. New York Times Co.*, 84 F.R.D. 626 (S.D.N.Y.1979); *Lora v. Board of Educ. of the City of New York*, 74 F.R.D. 565 (E.D.N.Y.1977).

**8.** Only if defendants explicate the reasons for the denial of reappointment with tenure can Gray proceed to meet his burden of proof that the nondiscriminatory motives advanced by the defendants are merely pretextual. This *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), analysis, though first developed in Title VII cases, applies equally in cases brought under 42 U.S.C. § 1981. *See, e.g., Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 270 (4th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976); *Waters v. Wisconsin Steel Works of Int'l Harvester Co.*, 502 F.2d 1309, 1316 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

*See Lynn v. Regents of the University of California,* 656 F.2d 1337, 1347–48 (9th Cir. 1981); *Jepsen v. Florida Board of Regents,* 610 F.2d 1379, 1384–85 (5th Cir.1980); *Keyes v. Lenoir Rhyne College,* 552 F.2d 579, 581 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977).

Our problem is that we are obliged to rule not at trial but on discovery, when the precise litigating posture has not yet become known. Consequently we do not pass on the question how far discovery may go and particularly do not do so in connection with confidential communications from persons outside the college. However, the foregoing analysis seems to indicate that a college could defeat the demand for disclosure by disclaiming a defense that will require disclosure to rebut. An approach like this, of trying to find out what plaintiff's needs really are, has been used with respect to the newsman's privilege. *See McGraw Hill, Inc. v. Arizona,* 680 F.2d 5, and cases cited at 8 (2d Cir. May 18, 1982). We commend it to the district court. But at this stage, forced as Dr. Gray is to chase an invisible quarry, without at least knowing the votes, he can hardly be said to have a "full and fair opportunity," to demonstrate employment discrimination. *Texas Department of Community Affairs v. Burdine,* 450

U.S. 248, 255–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). *See also id.* at 258, 101 S.Ct. at 1096, *citing with approval Loeb v. Textron, Inc.,* 600 F.2d 1003, 1011–12 n. 5 (1st Cir.1979) ("a plaintiff cannot be expected to disprove a defendant's reasons unless they have been articulated with some specificity").

Merely by furnishing an after-the-fact statement of reasons the defendants cannot fill the void left by the Committee's conclusory decision,[9] especially in light of the fixed policy against giving such reasons. But if unable to engage in discovery, Dr. Gray cannot prove intent, and without proof of intent, he has no case. In certifying the interlocutory appeal, Judge Haight, to whom Gray's case was reassigned, found that the votes of the Committee members were an indispensable element of Dr. Gray's case without which proof of an intent to discriminate could be impossible. *Gray v. Board,* No. 79 Civ. 62–CSH, Memorandum Opinion & Order (S.D.N.Y. Dec. 14, 1981).[10] We agree with Judge Haight's view and note that, where such evidence is essential to an element of a plaintiff's case, the Supreme Court has allowed discovery of private deliberations despite a claim of First Amendment privilege. *Herbert v. Lando, supra.*

**9.** Since the faculty has the primary responsibility for judging candidates, *Haimowitz v. University of Nevada,* 579 F.2d 526, 530 (9th Cir. 1978), the right to obtain a written statement of the President's reasons for his decision not to overturn the peer review committees, a right available under the collective bargaining agreement, is insufficient; he may simply rely, and will usually be relying, solely on the faculty committee's decision.

**10.** The Magistrate's Report and Recommendation to Judge Pierce on the plaintiff's motion, which recommended discovery of the votes, also found that the information sought by the plaintiff was "relevant and essential to his effort to prove his claim of racial bias." *Gray v. Board of Education,* 79 Civ. 0062, Magistrate's Report and Recommendation 15 (S.D.N.Y. April 7, 1981).

While other evidence was available to Dr. Gray, its probative value was limited at best. The district court noted that Dr. Gray had already discovered the evaluations on which the P&B Committee decision "*presumably* rested." 92 F.R.D. at 93 (emphasis added). But the possession of these conflicting evaluations tells

us nothing about the way that they were actually used unless we know the votes themselves or have a statement from the Committee setting out its reasons for refusing to rehire Dr. Gray. And while it is true that in some cases statistical disparities alone may be sufficient to prove a pattern of discriminatory action against minorities, *see International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977), we agree with the EEOC that there may well be cases of individual race discrimination where statistical evidence is not available. This may be because the individual case is an isolated event at an institution where there is not any pattern of race discrimination, *see Dickerson v. United States Steel Corp.,* 582 F.2d 827, 830–31 (3d Cir.1978), or because, by virtue of the small number of employees or the uniqueness of the positions at issue, reliable statistical evidence may not be available, *see Wilkins v. University of Houston,* 654 F.2d 388, 409 (5th Cir.1981). That seems to be the case here.

The district court found that Gray's need for disclosure, which we find compelling, was outweighed by LaGuardia's need for the confidentiality of peer review committee deliberations and votes. The district court and appellees have argued that if the courts allow this protected sphere to be invaded, candid peer evaluation will be chilled, the harmony of faculty relations will be disturbed, and academic freedom will be threatened by government intrusion into the life of colleges and universities.

These concerns, all of them real ones, are taken into account by the policy and procedure proposed to us by the American Association of University Professors (AAUP). The AAUP's brief suggests that "[i]f an unsuccessful candidate for reappointment or tenure receives a meaningful written statement of reasons from the peer review committee and is afforded proper intramural grievance procedures," disclosure of individual votes should be protected by a qualified privilege. AAUP Brief at 23.[11]

Certain AAUP policy statements have assisted the courts in the past in resolving a wide range of educational controversies, such as off-campus speech by professors, *Adamian v. Jacobsen,* 523 F.2d 929, 934 (9th Cir.1975) (AAUP Advisory Letter on Extramural Utterances); and notice requirements, *Cusumano v. Ratchford,* 507 F.2d 980, 986 n. 14 (8th Cir.1974) (AAUP Advisory Letter on Notice of Nonrenewal). The AAUP's 1971 Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments ("Statement"), cited with approval by federal courts in *Kunda v. Muhlenberg College,* 621 F.2d 532, 544 n. 5 (3d Cir.1980); *Blair v. Board of Regents,* 496 F.2d 322, 324 (6th Cir.1974); and *Bruce v. Board of Regents,* 414 F.Supp. 559, 562 n.

2 (W.D.Mo.1976), also received a measure of endorsement from the Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 579 n. 17, 92 S.Ct. 2701, 2710 n. 17, 33 L.Ed.2d 548 (1972).

That AAUP Statement, insofar as it is applicable here, concludes that faculty members, upon request, should be informed in writing of the reasons for a decision against reappointment. Recognizing the latitude that must be given the institution acting through its faculty, but balancing academic freedom against standards of fairness, the Statement seeks to take into account the confusion that can occur between the limited rights of probationary faculty members and the due process rights guaranteed to tenured faculty, but nevertheless determines that reasons must be given the faculty member denied reappointment or tenure who requests them. This is to permit the rejected probationer to remedy identified shortcomings, to correct erroneous information on which the peer review committee based its decision, as well as perhaps to realize that the decision resulted from institutional considerations unrelated to his or her competence. A statement of reasons also may serve to avoid arbitrariness or lack of consideration in the decision-making body itself.[12] *See generally Drown v. Portsmouth School District,* 435 F.2d 1182, 1184–85 (1st Cir.1970).

We believe the position of the AAUP on the precise matter before us to be carefully designed to protect confidentiality and encourage a candid peer review process. It strikes an appropriate balance between academic freedom and educational excellence on the one hand and individual rights to fair consideration on the other, so that

---

**11.** The American Council on Education (ACE), an organization composed of more than half of all American colleges and universities, takes a position not far from that of the AAUP. See ACE Guideline, *Confidentiality of College and University Faculty Personnel Files: Its Appropriate Role in Institutional Affairs* (Dec.1981). The Guideline emphasizes the importance of confidentiality, but does not equate it with secrecy. Therefore, confidentiality must be accompanied by publicly-known evaluation procedures, an avenue for redress, and an opportunity "to know and to benefit from the deliberation of peers." *Id.* at 1.

**12.** We note that in addition to a written statement of reasons, the AAUP Statement recommends that faculty members have the opportunity for review by a second faculty body of an initial decision against renewal. We need not take any position in respect to this requirement in this case, however, and do not do so.

courts may steer the "careful course between excessive intervention in the affairs of the university and the unwarranted tolerance of unlawful behavior," mentioned in *Powell v. Syracuse University*, 580 F.2d 1150, 1154 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). We believe this position recognizes the differences between private business and academic institutions stressed by the Supreme Court in *NLRB v. Yeshiva University*, 444 U.S. 672, 680–81, 100 S.Ct. 856, 861, 63 L.Ed.2d 115 (1980).

Rather than adopting a rule of absolute disclosure, in reckless disregard of the need for confidentiality, or adopting a rule of complete privilege that would frustrate reasonable challenges to the fairness of hiring decisions, our decision today holds that absent a statement of reasons, the balance tips toward discovery and away from recognition of privilege. A policy requiring disclosure of votes in the absence of stated reasons when they have been requested permits a plaintiff a fair opportunity to uncover evidence necessary to establishing a prima facie case of discrimination. But unlike a rule of complete disclosure, the discovery permitted in this case will not chill peer review decisions. Future decisions supported by a detailed statement of reasons given to the faculty member on request will be shielded from routine discovery. *Past* peer review decisions for which no reasons were given may be discoverable, but they have already been made and the internal workings of those decisions can not be affected at all by our adoption of the AAUP position. Thus, colleges and universities lose none of the benefits of the candor that informed those decisions.

The risk that revelation of committee votes will lead to faculty disharmony is also reduced or eliminated by the qualified privilege established here. Where the faculty member has been denied tenure by the committee, whatever "harmony" may have existed between that applicant and the rest of the faculty is already largely lost, and unless the applicant is reinstated, no harm would follow the loss of harmony. If the complaint is that disappointed tenure applicants will not get along harmoniously with the faculty members who discriminated against them when these applicants are later reinstated because they prove that the reasons for not hiring were pretexts for racial discrimination, then we find the interest in collegial goodwill in that context to be easily outweighed.[13] *Cf. Trammel,* 445 U.S. at 52, 100 S.Ct. at 913 (husband-wife privilege, based on need to preserve marital harmony inapplicable where "one spouse is willing to testify against the other in a criminal proceeding" because "there is probably little in the way of marital harmony for the privilege to preserve").

We add, finally, that "academic freedom" will not be significantly threatened by our decision here, which poses no significant hazards to peer review and collegial interaction. While a rule allowing routine discovery of tenure votes could chill frank discussion and engender disharmony among faculty, the institution's substantial adherence to the principles and procedures espoused in the AAUP statement will in many cases avert the need for judicially-enforced discovery. In those circumstances, unlike the case before us today, it may be appropriate to assert a qualified academic peer review privilege. We concede that the argument could be pressed that some residual risk of chill or disharmony will remain after adoption of a qualified privilege, perhaps because review committee voters will fear that the veil of stated reasons may be pierced and votes revealed, or perhaps simply because a change in the rules of discovery itself introduces an inhibiting element of fluctuation and uncertainty.

The assertion of a marginal infringement on the processes of peer selection, however, cannot be sufficient to dispose of the rights of a claimant like Dr. Gray. In this case such an assertion is outweighed both by the demands of fair employment as well as those of academic excellence and freedom. In *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Supreme Court acknowledged that academic freedom included as one of its elements the right of colleges and universities to choose their students, but found that this interest was outweighed by the right of applicants to equal

---

**13.** The disharmony argument does not apply to successful applicants, because they will have no interest in disclosure sufficient to outweigh the need to maintain the confidentiality of the votes of the minority of the members of the reviewing committee who voted against them.

Of course, this argument applies less strongly to faculty who only seek and are denied *promotion* rather than tenure and who after their requests for promotion are denied, continue to serve alongside *the same* faculty members who may have voted against them.

protection. In the context of peer selection as well, academic freedom cannot be paramount to all other rights. No person may be refused a teaching contract renewal for constitutionally impermissible reasons. *Perry v. Sindermann,* 408 U.S. 593, 596–97, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Here, the effect of our rule on academic freedom is minor while the impact of an unqualified privilege on the civil rights of rejected tenure applicants would be major.

Moreover, it should be recalled that "academic freedom" is a concept fashioned from other constitutional rights, including the First Amendment and due process rights of faculty to avoid censure for the views they teach and espouse.[14] It is true that these rights stand for more than the mere aggregation of the First Amendment freedoms of individual faculty members and students when they are exercised on campus—a forum whose high and chief purpose is the robust exchange of ideas—and that academic freedom thus stands apart from the freedom of those individuals who exercise it. But academic freedom is illusory when it does not protect faculty from censurious practices but rather serves as a veil for those who might act as censors. Because our decision today inhibits capricious nonrenewal of employment based on race rather than academic grounds, we believe it to be basically consistent with the goals of academic freedom.[15]

Judgment in accordance with opinion.

**LEONARD P. MOORE, Circuit Judge (concurring):**

I concur in Judge Oakes' opinion to the extent that the opinion states "our decision today holds that absent a statement of reasons, the balance tips towards discovery and away from recognition of privilege" and that such a statement will "permit the rejected probationer to remedy identified shortcomings, to correct erroneous information on which the peer review committee based its decision, as well as perhaps to realize that the decision resulted from institutional considerations unrelated to his or her competence."

In my opinion the statement should be that of the P & B committee rather than that of the two members thereof who, insofar as the record discloses, have not been authorized to speak for the committee. Both Magistrate Washington and Judge Pierce were mindful of the possibility of a protective order. Such an order might issue in the event that future developments in the depositions go beyond the spirit of Judge Oakes' opinion, but it is not for the Court of Appeals to outline the course of future discovery. I only express the *caveat* that the federal courts not add the selection and promotion of college faculty to their already manifold problems.

### On Rehearing

On petition for rehearing, the appellees argue that a presidential statement of reasons, note 9 *supra*, is sufficient (a) by virtue of the president's participating and review-

---

**14.** *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (striking down, on First Amendment grounds, a New York law requiring faculty to disavow membership in the Communist Party); *Sweezy v. New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (reversing conviction of professor for refusal to testify about his politics, beliefs, and contents of his lectures); *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (summary dismissal of professor for asserting privilege of self-incrimination violates due process); *Adler v. Board of Education,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (teacher must be given hearing and opportunity to rebut charge of knowing membership in subversive organization); *see also Regents of the Univ. of Calif. v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978); Van Alstyne, *The Rights of Teachers and Professors* in The Rights of Americans 546 (Dorsen ed. 1971).

**15.** Justice Frankfurter's oft-quoted statement of " 'the four essential freedoms' of a university—to determine for itself *on academic grounds* who may teach, what may be taught, how it shall be taught, and who may be admitted to study," *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (emphasis added) is by no means inconsistent with this decision though arguably to some extent universities may be discouraged from certain decision-making on unconventional, though wholly legitimate, academic grounds.

Our decision today seeks so far as possible to be consistent with the First Amendment aims of academic freedom: unreviewable committee tenure decisions may promote the robust exchange of views within the sealed confines of the committee room but also serve to exclude tenure candidates from the college campus because of their race. The light cast on tenure decisions by a statement of reasons or a revelation of votes can prevent this untoward result.

ing role in peer review proceedings and (b) by virtue of a gloss put on the collective bargaining agreement by arbitrators' decisions that require the president to undertake an independent review of the decision of the peer review committee(s). The appellee thus argues that, contrary to the statement in footnote 9, the president may not "simply rely" and will not "usually be relying, solely on the faculty committee's decision." We continue to disagree with argument (a). We demur as to argument (b). Without foreclosing the appellees from making argument (b) in subsequent cases, we note that in any event no presidential statement of reasons was made here, and no committee statement was made or required by the collective bargaining contract. Courts weighing the proper scope of compelled disclosure in a civil rights action are not constrained, of course, by a collective bargaining agreement.