**Frank WILKINSON, et al., Plaintiffs,**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants.**

**No. CV 80–1048 AWT.**

United States District Court, C.D. California.

July 28, 1986.

See also, D.C., 633 F.Supp. 336.

Paul A. Hoffman, ACLU Foundation, Los Angeles, Cal., Douglas E. Mirell, Peter N. Scolney, Debra J. Albin-Riley, Steven P. Tapia, David P. Crochetiere, Kenneth N. Russak, Los Angeles, Cal., Philip J. Hirschkop, Alexandria, Va., for plaintiffs and for Deponent and Moving Party, Anne Braden.

Richard K. Willard, Asst. Atty. Gen., Civil Division, Bill Lann Lee, Los Angeles, Cal., for amici curiae Sara Cooper, Dale C. Treleven, Ronald J. Grele, Arthur A. Hansen, Debra Gold Hansen, Clay Carson, Howard Zinn, Stanley Sheinbaum and The Nation Institute.

Bronson C. LaFollette, Atty. Gen. of Wis., Charles A. Bleck, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., as amicus curiae.

John J. Farley, III, Director, R. Joseph Sher, Senior Trial Counsel, Esther I. Estryn, Trial Atty., Torts Branch, Civil Division, Dept. of Justice, Washington, D.C., Robert C. Bonner, U.S. Atty., Elgin Edwards, Diane Bardsley, Asst. U.S. Attys., Los Angeles, Cal., for defendants.

## MEMORANDUM DECISION AND ORDER

TASHIMA, District Judge.

This is an action arising out of the Federal Bureau of Investigation's ("FBI") surveillance and investigation of the National

Committee Against Repressive Legislation ("NCARL")[1] and Frank Wilkinson ("Wilkinson"), NCARL's former Executive Director. Plaintiffs allege, *inter alia*, that the FBI conducted its investigation for an improper motive, *i.e.*, to monitor and harass plaintiffs in the exercise of their First Amendment rights, and employed various illegal investigatory techniques, *e.g.*, so-called "black bag" jobs, in violation of 42 U.S.C. §§ 1983–1986 and the United States and California Constitutions. They seek money damages and injunctive relief. Plaintiffs are NCARL, Wilkinson and four sustaining members of NCARL. In addition to the named plaintiffs, the Court also has certified a class, for the purposes of damages only, consisting of all individuals who have been sustaining members of NCARL for at least one year from 1960 to the present. *See Wilkinson v. FBI*, 99 F.R.D. 148 (C.D.Cal.1983).

On March 25, 1986, defendants served Anne Braden ("Braden"), a long-time civil rights activist in Kentucky, with a subpoena duces tecum re deposition. The subpoena required that Braden produce "all documents pertaining to the National Committee Against Repressive Legislation in the witness' possession, custody, or control." Plaintiffs and Braden have moved for a protective order that the documents need not be produced.[2] Taking of the deposition has been deferred pending the Court's ruling on the motion.

### BACKGROUND [3]

Braden has been involved in the civil rights movement in the South for over 30 years, primarily with the Southern Conference Educational Fund ("SCEF"). She and her husband, Carl Braden, started out as organizers for the SCEF, and were the Executive Directors of the group from 1966 to 1972. Braden became involved in the effort to abolish the House Un-American Activities Committee when her husband Carl was jailed in 1961 for refusing to answer the Committee's questions regarding the integration movement.[4]

During this period, Braden worked with NCARL's predecessor, the National Committee to Abolish the House Un-American Activities Committee ("NCAHUAC"). Since that time, she has periodically made financial contributions to NCARL and she has been a Vice Chair of NCARL for many years. As indicated, although Braden is not a named plaintiff in this action, all parties agree that she is a member of the plaintiff class.

The documents at issue are the personal files of Carl and Anne Braden, compiled in the course of their many years of activism in the civil rights movement in the South. The files consist of over 240 boxes of documents, tapes and microfilm and were donated to the State Historical Society of Wisconsin (the "Historical Society") in several installments, beginning in 1966. Each of these donations was made pursuant to an agreement between the Bradens and the Historical Society under which the society agreed that access to the documents would be restricted to those persons having writ-

---

1. NCARL, formerly known as the National Committee to Abolish the House Un-American Activities Committee, was formed to oppose and abolish the so-called McCarthy investigations. The group has continued to remain active since the House Committee was dissolved, opposing legislation it views as repressive.

2. Braden is not a named plaintiff, but is a member of the plaintiff class. She also is Vice Chair of NCARL. The documents are claimed to be her personal documents and not those of NCARL. Braden is a resident of the Western District of Kentucky and the documents' physical location is in the Western District of Wisconsin. Braden has stipulated to this Court's personal jurisdiction over her for purposes of the pending motion, *i.e.*, that the ruling would have the same force and effect as if rendered by the United States District Court for the Western District of Kentucky. *See* F.R.Civ.P. 26(c) & 45(d)(2).

3. The facts set forth below are taken from the Bradens' biographical information prepared by the State Historical Society of Wisconsin. *See* Index to Braden Collection, at 3–4. These facts are uncontested and are taken as true for the purposes of this motion.

4. *See Braden v. United States*, 365 U.S. 431, 81 S.Ct. 584, 5 L.Ed.2d 653 (1961).

ten permission from Braden to study the files.[5] The agreement has a five-year term. Upon its expiration, the general public is to have access to the documents. However, the agreement is renewable by Braden personally and she has renewed it every five years. The agreement's current renewal/expiration date is January 1, 1987. Braden states that she intends to renew it at that time for an additional five-year term.

Defendants became aware of the Braden collection during the course of discovery, in early 1986. After several unsuccessful efforts informally to obtain access to the documents, they noticed Braden's deposition and caused the subpoena duces tecum in question to be issued.

## ISSUES

Braden's motion for a protective order is based on three alternative grounds:

1. That she has a qualified First Amendment privilege against disclosure, on the basis that the subpoena infringes her rights of free association, free speech and privacy, and cannot meet the heightened level of scrutiny mandated by that privilege.

2. That because the documents are deposited in an archive and are used by scholars, access to the government should only

be granted if such discovery meets the criteria applicable to a claim of First Amendment privilege. She is joined in the assertion of this "archival" privilege by a group of scholars, historians and archivists who have filed an amici brief arguing for the creation and application of such a new archival privilege to the documents in question and by the Attorney General of the State of Wisconsin, as amicus.

3. That even if the Court declines to apply the above privileges, the call of the subpoena should be narrowed because it is unduly burdensome and unreasonably cumulative under F.R.Civ.P. 26(b)(1).

For the reasons set forth below, I conclude that Braden's motion should be denied.[6]

## DISCUSSION

1. *The First Amendment Associational Privilege.*

Braden argues that because the files were accumulated during her many years of political activism, and are the complete record of her political activities and associations, disclosure of these records to the government would be a direct intrusion upon her First Amendment rights of freedom of association, speech and privacy.[7]

---

5. The Restriction Agreement of Oct. 20, 1977, provides in pertinent part:
    1) All items in the collection, except printed matter such as books, pamphlets, etc. and mimeographed material originally intended for public interest, are restricted.
    2) Permission to use restricted materials must be obtained from Anne Braden. This condition shall not apply to employees of the State Historical Society of Wisconsin engaged in normal archival processes.
    3) The conditions of use outlined above for the Braden Collection also apply to the [SCEF] papers ..., which were added to the Collection in 1974 and research access to which has been restricted in the same manner as the Collection as a whole.
    The State Historical Society of Wisconsin will exhaust all available legal remedies to maintain and protect the above contractual agreement, based upon the statutory authority granted under sec. 44.015(3), Wisconsin Statutes, 1975.

6. However, use of the information discovered in Braden's files continues to be restricted by the limited, stipulated Protective Order of May 7, 1986. Under that order all documents produced by Braden shall be available only to the parties and their counsel; shall be used only for the defense of this case; shall not be incorporated into any index or investigative file maintained by the FBI; and shall not be released to the public, except that the documents may be used in motions or as evidence in this case.

7. She also contends that because many third parties who may wish to remain unidentified are mentioned in her files, the subpoena in question is a potential infringement upon their First Amendment rights as well. Because Braden obviously lacks standing to assert the "potential" First Amendment claims of others, this contention will not be addressed further.

Braden thus argues that the Court should apply a qualified privilege to the documents in question, thereby subjecting the government's subpoena to a heightened level of scrutiny. She then contends that the subpoena falls short of the requisite First Amendment standard.

In support of this argument, Braden cites several cases applying a qualified First Amendment associational privilege in the context of discovery. However, all of these cases are clearly distinguishable from the one at bench. The information sought to be protected in each of those cases was a group's membership list or list of financial contributors—information at the core of the group's associational activities. In contrast, Braden seeks to apply the privilege not to specific membership documents, but instead to prevent any discovery of her files. While it is clear that the privilege may be asserted with respect to specific requests for documents raising these core associational concerns, it is equally clear that the privilege is not available to circumvent general discovery. Because Braden has failed to show as a threshold matter that the privilege is applicable to the discovery request at issue, the Court cannot issue a protective order on that basis.

■ Although there are relatively few cases applying a First Amendment privilege to discovery disputes, it is settled that such a privilege exists. *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *see also, e.g., Britt v. Superior Court,* 20 Cal.3d 844, 143 Cal. Rptr. 695, 574 P.2d 766 (1978). Under this privilege, once a litigant has raised a substantial claim by showing that the discovery request is directed at the heart of a group's protected associational activities, the court is required to subject the request to a higher level of scrutiny. *See, e.g., International Union, UAW v. National Right to Work Legal Defense and Educ. Fund, Inc.,* 590 F.2d 1139, 1152 (D.C.Cir. 1978). The privilege is qualified, not absolute; therefore, it cannot be used as a blanket bar to discovery. Instead, the Court must apply a balancing test to the dispute at issue, essentially requiring both a heightened degree of relevance to the subject matter of the suit and a showing by the party seeking discovery that it has made reasonable, unsuccessful attempts to obtain the information elsewhere.[8] *Id.*

■ However, it is unnecessary to determine whether these criteria have been met, because, as a threshold matter, Braden has not shown that the privilege should apply here.[9] A review of the cases applying the privilege reveals that in each case the discovery that was subject to enhanced First Amendment scrutiny was a specific request for a group's membership list or list of financial contributors. For example, in *NAACP v. Alabama,* the seminal case in this area, the issue was whether the NAACP could be compelled to disclose the identity of its rank and file members, after it had disclosed substantially all of the other information requested.

The Supreme Court reversed the contempt citation against the NAACP, holding that where discovery is sought of the membership list of a group such as the NAACP, the potential infringement upon the group's and members' rights to free association and free speech mandate that the court subject the request to enhanced scrutiny under the First Amendment. 357 U.S. at 462, 78 S.Ct. at 1171–72. In view of the

---

**8.** A three-part test is formulated in *Adolph Coors Co. v. Wallace,* 570 F.Supp. 202, 208 (N.D.Cal. 1983):

(1) ascertain whether the precise material sought by discovery is truly "relevant" to the gravaman of the complaint; (2) if "relevant", the court must balance the rights and interests of each litigant, the particular circumstances of the parties to the controversy, and the public interest in overriding the private litigants' representations as to resultant injury or to unavoidable need; and (3) a conclusion that the discovery request, as framed, is the means least inclusive and intrusive for gathering the information to which the party has been deemed entitled.

**9.** For the same reason, it is unnecessary to decide whether, as defendants assert, Braden has waived her First Amendment privilege by permitting certain scholars to use the documents.

showing that past revelation of the identity of the NAACP's members had exposed them to hostility, violence and loss of employment, the Court held that disclosure of the membership lists could not be justified by the State's interest in enforcing its corporate registration laws. The Court held that this was especially true in view of the fact that the NAACP had offered to comply in all respects with the state qualification statute, and had voluntarily disclosed its business records, charter and statement of purposes, the names of all of its officers and directors, and the total number of its Alabama members and the amount of their dues. *Id.* at 464–65, 78 S.Ct. at 1172–73. The only information that the group withheld was the list containing the names of its rank-and-file members. And it was to this information only that the Court applied the First Amendment associational privilege. *See also, International Union, UAW,* 590 F.2d at 1152–53; *Adolph Coors Co. v. Wallace,* 570 F.Supp. 202, 207–10 (N.D.Cal.1983).[10]

As is apparent from these cases, the First Amendment associational privilege has been applied only in situations where the discovery request specifically required disclosure of the names of a group's members or financial contributors. In no case cited by Braden has the Court applied the privilege to a general discovery request such as the one at issue. The cases do not justify the blanket assertion of the First Amendment associational privilege against a general discovery request. The litigant must, at least, make some showing that the information sought would impair the group's associational activities. No such showing has been made here. Therefore, because Braden has failed to show that the privilege applies as a threshold matter to the dispute in question, her request for a protective order cannot be granted on this ground.

## 2. *The "Archival" Privilege.*

■ Braden's second line of argument is that even if the Court rejects the application of the First Amendment privilege to the subpoenaed material, it should still issue a protective order on the basis of a proposed "archival" privilege. She is joined in this argument by nine scholars, academicians and archivists, who appear as amici on this issue. They contend that if the government is allowed access to Braden's files, in spite of the access restrictions negotiated between Braden and the Historical Society, persons with important historical documents will be dissuaded from donating their materials to archives. Amici argue that the resultant reduction in the availability of such research materials would severely infringe upon the interests of the archives and scholars in promoting the free flow of information and academic debate in our society. Braden and the amici view this threat as significant enough to require that this Court create a novel archival privilege, triggering the type of constitutional balancing of interests used under the First Amendment associational privilege.[11]

Neither Braden nor the amici could cite any case applying an archival privilege, and the Court has found none—indeed, this question appears to be one of first impression. Instead, Braden and the amici argue by analogy, citing statutory law regarding archival restrictions, cases mentioning the right to academic freedom, and opinions discussing the possible creation of a researcher's privilege not to disclose his sources and confidential notes. However, as will be explained below, none of the authorities cited mandates the creation of an archival privilege and most are distinguishable from the case at hand. Therefore, in view of the absence of persuasive authority on this point, the Court holds that the facts of this case are simply not suffi-

---

**10.** Other lower court cases are in accord. *E.g. Black Panther Party v. Smith,* 661 F.2d 1243 (D.C.Cir.1981), *vacated on other grounds* (mootness), 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982); *Britt v. Superior Court,* 20 Cal.3d 844, 143 Cal.Rptr. 695, 574 P.2d 766 (1978).

**11.** Braden is, therefore, arguing for a qualified, rather than absolute, privilege.

ciently compelling to justify the creation of a wholly new archival privilege.[12]

### A. Privilege Generally.

The starting point for any analysis of privilege is the oft-stated principle that the public has a right to every person's evidence, absent a valid claim of constitutional, common law or statutory privilege. *See, e.g., United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The governing rule, F.R.Evid. 501, provides that where, as here, a suit is based upon federal law, any claim of privilege is governed by the "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." While this rule leaves the federal courts power to create new privileges as the need arises, *Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 910–11, 63 L.Ed.2d 186 (1980), this power is to be narrowly construed and is to be used only after careful thought and a strong showing of need for the privilege:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that "the public ... has a right to every man's evidence." *United States v. Bryan,* 339 U.S. 323, 331 [70 S.Ct. 724, 730, 94 L.Ed. 884] (1950). As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Elkins v. United States,* 364 U.S. 206, 234 [80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669] (1960) (Frankfurter, J., dissenting).

*Id.* at 50, 100 S.Ct. at 912. *See also United States v. Nixon,* 418 U.S. at 710, 94 S.Ct. at 3108 ("Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor

expansively construed, for they are in derogation of the search for truth."); *In re Dinnan,* 661 F.2d 426, 430 (5th Cir.1981), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982).

### B. Statutory Law.

With these admonitions in mind, we examine Braden's argument. Conceding that there is no archival privilege at common law, Braden and the amici contend that the Court should use its power under Rule 501 to create such a privilege as an interpretation of the common law "in the light of reason and experience."

Braden and the amici first argue that an archival privilege has received at least implicit recognition in both federal and Wisconsin statutory law. They point to the federal statutes authorizing the National Archives to accept private papers and historical records subject to agreements restricting access and argue that this indicates a Congressional recognition of the value of archives and a tacit approval of the asserted archival privilege. *See* 44 U.S.C. §§ 2112, 2204. While these statutes do indeed authorize the National Archives to accept donations of materials subject to negotiated restriction agreements, such agreements can only limit access by unauthorized third parties; there is no indication that such restrictions are absolute or that they exempt the documents from judicial process. Indeed, the Presidential Records Act of 1978 specifically provides that such records are to be made available pursuant to judicial process "for the purposes of any civil or criminal investigation or proceeding," regardless of any access restriction. 44 U.S.C. § 2205(2)(A).

Nor does Wisconsin law appear to create an archival privilege. In a separate amicus brief filed at the request of plaintiffs, the Attorney General of the State of Wisconsin discusses the Wisconsin statutory scheme pertaining to Braden's files. He notes that the Historical Society is an official agency

---

**12.** It is thus unnecessary to address the government's argument that Braden's selective disclosure of the files to certain scholars has waived the archival privilege, if any such privilege exists.

and trustee of the state, Wis.Stat. § 44.01(1), and is authorized to accept, preserve and catalogue materials donated to the Society's archives. *Id.* § 44.015(3), 44.02(1), 44.02(6). He asserts that the legislative history of these provisions indicates that the legislature sought to encourage the donation of private papers which might not otherwise be donated due to their sensitive or private nature. In keeping with this goal, the Wisconsin legislature enacted § 44.015(3), which empowers the Society to:

> Accept collections of private manuscripts, printed materials, tapes, films and artifacts, and it may enforce any and all reasonable restrictions on accessibility to the public, use or duplication of said collections which are agreed upon by the donor and the historical society.

*Id.* § 44.015(3).

Both Braden and the amici make much of this provision, arguing that it creates a state law privilege that should guide this Court in formulating a federal common law privilege. Braden further points to the Historical Society's agreement that it would "exhaust all available legal remedies to maintain and protect the ... agreement, based upon the statutory authority granted under sec. 44.015(3)...."

Close analysis indicates that it is unclear whether or not § 44.015(3) creates a new archival privilege under Wisconsin law [13] and it is unnecessary for the Court to decide this issue. The underlying claims in the case at bench are based upon federal, not Wisconsin, law and thus Wisconsin

privileges, whatever they may be, are not controlling under Rule 501. Their only relevance is whether they might assist the Court in its inquiry under Rule 501 into how the federal common law on this issue should be interpreted. However, because it is unclear exactly what the status of an archival privilege would be under Wisconsin law, and because the Wisconsin courts have not yet addressed this issue (*see* Amicus Brief of Bronson C. LaFollette, Attorney General of Wisconsin, at 5), the court concludes that § 44.015(3) is simply not persuasive enough authority to justify the adoption of a federal common law archival privilege.

Especially in light of this ambiguity in Wisconsin law, there is no reason not to apply federal statutory law to this federal common law question. *See Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650, 663–64 (9th Cir.1981) (Tashima, J., concurring) (application of federal statute as federal common law). Here, the Presidential Records Act of 1978, 44 U.S.C. § 2201 *et seq.*, appears to be the pertinent statute to look to. That Act, while authorizing the President to restrict access to certain categories of Presidential records for as long as 12 years, § 2204, expressly excepts from restriction records required to be produced "pursuant to a subpoena or other judicial process issued by a court of competent jurisdiction for the purpose of any civil or criminal investigation or proceeding." § 2205(2)(A). Thus, examination of relevant statutory authority is persuasive that

---

**13.** The Court is unable to decide, on the basis of the briefing before it, whether § 44.015(3) creates an evidentiary privilege that can be used to resist discovery in judicial proceedings or whether it merely empowers the Historical Society to enforce the access restrictions against members of the public or third parties. The Attorney General states that this is a matter of first impression for the Wisconsin courts. Without citing any legislative history or analogous case or statutory authority regarding privilege in Wisconsin generally that might assist the court in evaluating his claim, he simply asserts that § 44.015(3) creates a new state law privilege.

As the government points out, however, this contention is undermined by the fact that,

unlike federal law, Wisconsin has adopted a comprehensive codification of privilege law which does not include an archival privilege. *See* Wis.Stat. §§ 905.01–905.10. Moreover, § 44.015(3) merely states that the Society may enforce "reasonable restrictions" on access by members of the public. It makes no mention that it is creating a new evidentiary privilege or that documents donated to the Society are beyond the reach of judicial process.

This is a question the resolution of which is not necessary to the present decision. Because the Wisconsin courts have yet to address the issue and because it has not been extensively briefed by the parties, the Court expressly declines to rule on the question.

no archival privilege exists as against judicial process.

### C. Academic Freedom and the Researcher's Privilege.

Braden and the amici cite two related lines of authority in support of their argument that an archival privilege is mandated by the Constitution. They point to cases discussing the right to academic freedom and to opinions involving the so-called researcher's privilege and attempt to combine these two lines of authority to support a constitutional privilege of donors not to reveal documents placed in an archive under a restricted access agreement. Close examination of the cases cited, however, makes clear that neither of these privileges is, as yet, universally accepted by the courts and, where the courts do recognize them, the courts tend to apply them only to a narrow set of circumstances distinguishable from those at hand. Braden's argument is, therefore, ultimately unpersuasive.

Braden and the amici begin by pointing out that the Supreme Court has recognized that the right to academic freedom is protected by the First Amendment. *Keyishian v. Board of Regents,* 385 U.S. 589, 603–04, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967) (holding unconstitutional an anticommunist New York "loyalty oath" required of university teachers); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 261–62, 77 S.Ct. 1203, 1211, 1217, 1 L.Ed.2d 1311 (1957) (reversing contempt citation of leftist university lecturer who refused to disclose the content of his university lectures). Braden argues that the right to academic freedom should not be limited to university professors and institutions of higher learning, but should be expanded to encompass archives and donors to them.

While it is undisputed that the Supreme Court has recognized a general right to academic freedom, there is a debate among the circuits as to how far this right extends and how it is to be balanced with other considerations. Cases involving employment discrimination claims in the context of university tenure decisions illustrate this point: there is currently a split among the circuits regarding how to balance the right to academic freedom and the confidentiality of the peer review process, with an employment discrimination plaintiff's need for access to proof of discrimination.

Braden cites two of these cases in support of her contention that courts have recognized a general academic freedom privilege. The strongest case in support of this point is *EEOC v. University of Notre Dame du Lac,* 715 F.2d 331, 337–39 (7th Cir.1983), where the court recognized a *qualified* First Amendment-based academic freedom privilege protecting academic institutions against the disclosure of the names and identities of persons participating in the peer review process. She also relies on *Gray v. Board of Higher Education,* 692 F.2d 901, 904–05 (2d Cir.1982), where, although the court explicitly declined to adopt an academic freedom privilege, it nonetheless held that the trial court could, under its discretion to regulate discovery, integrate the academic freedom analysis into a balancing approach in tenure discrimination cases.[14] *See also Zaustinsky v. University of Calif.,* 96 F.R.D. 622 (N.D.Cal.1983), *aff'd,* 782 F.2d 1055 (9th Cir.1985).

While Braden argues from these cases that the academic freedom privilege should be broadly applied to encompass the issue here, it is clear that both cases narrowly construed the privilege. Indeed, in *Gray,* although the court held that the principle of academic freedom required a balancing approach, it specifically refused to raise the balancing to the status of a privilege. Even in *Notre Dame,* the broadest of the opinions, the court applied only a *qualified* privilege, and held that the only information that could be redacted from the tenure review files was information directly identifying the faculty members and their

---

**14.** In *Gray,* however, the Second Circuit held that on the facts of the case before it, the balancing test came out in favor of *disclosure* of the tenure committee members' votes. 692 F.2d at 908.

votes. The university was required to turn over all other information in the tenure files to the plaintiff, and to submit unredacted copies of the documents to the district court so that it could assure that only information which would directly identify participating faculty members was deleted. 715 F.2d at 338.

Braden's argument is further undermined by the fact that at least two other circuits have rejected the application of an academic freedom privilege to tenure cases. In *In re Dinnan*, 661 F.2d at 430, the Fifth Circuit distinguished *Keyishian* and *Sweezy* on the ground that those cases dealt with a direct attempt by the government to suppress ideas and debate in the academic community. It held that a professor could not use academic freedom as a shield to refuse to disclose his vote in a tenure decision and upheld the lower court's contempt order against the professor. Similarly, the Third Circuit declined to follow *Notre Dame* and *Gray* in *EEOC v. Franklin and Marshall College*, 775 F.2d 110 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986).[15] The court held that no academic freedom privilege would be recognized in the Title VII area, in view of the Congressional mandate under Title VII to eliminate discrimination wherever it might be found. *Id.* at 114–15.

Whatever may be the outer limits of any academic freedom privilege, none of the cases supports assertion of such a privilege in this case. Like the First Amendment associational privilege, the cases that do apply an academic freedom privilege have tailored it narrowly to apply only to protect a university's tenure-related or other core function. No claim is made here that any such considerations obtain with respect to the sought discovery. The claim of academic freedom privilege is specious.

The assertion of the so-called researcher's privilege exhibits similar infirmities. Although several opinions appear to be sympathetic to such a privilege, there is no case which explicitly holds that such a privilege exists. Wright & Graham, *Federal Practice and Procedure, Evidence*, § 5430 (1980 & Supp.1986). Braden relies on two cases that come the closest to adopting the privilege and argues that they should be extended by analogy to create an archival privilege.

In the first case cited by Braden, *Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.*, 71 F.R.D. 388 (N.D.Cal.1976), the plaintiff moved to compel a third party researcher to testify and produce documents concerning certain confidential interviews he had conducted with PG & E employees in the course of a research project unrelated to the litigation. Although the court explicitly denied that it was creating any special researcher's privilege, *id.* at 389, it nevertheless integrated the researcher's interest in academic freedom and privacy into a balancing analysis of discovery burden and denied plaintiff's motion on the basis of the court's general authority to regulate discovery. Important to the court's analysis, which paralleled the analysis usually undertaken in the context of the journalist's privilege, were the facts that the professor was not a party to the litigation, the central focus of his study was not the subject of the underlying action and the information requested would have been largely supplementary. The court held that in light of those factors, the plaintiff's interest in the information was not strong enough to justify disclosure in the face of society's interest in fostering the work of researchers. *Id.* at 390.

The second case Braden cites is *Dow Chem. Co. v. Allen*, 672 F.2d 1262 (7th Cir.1982). There, the plaintiff sought to compel disclosure of a researcher's notes, working papers and raw data relating to a toxicity study of the plaintiff's herbicides, for use in an administrative hearing. The Seventh Circuit discussed the right to academic freedom mentioned in *Keyishian* and *Sweezy* and, without explicitly adopting a researcher's privilege, held that a research-

---

**15.** In his dissent from the denial of the petition for writ of certiorari, Justice White acknowl-edged the existence of an inter-circuit conflict on this issue. 106 S.Ct. at 2288–89.

er's interest in academic freedom was substantial enough that it should be used as a factor in the court's inquiry into whether the request was unreasonably burdensome.

However, other courts discussing the potential privilege have emphasized that any application of it would first require a threshold showing by the party asserting the privilege:

the application of a scholar's privilege, if it exists, requires a threshold showing consisting of a detailed description of the nature and seriousness of the scholarly study in question, of the methodology employed, of the need for assurances of confidentiality to various sources to conduct the study, and of the fact that the disclosure requested by the subpoena will seriously impinge upon that confidentiality.

*In re Grand Jury Subpoena,* 750 F.2d 223, 225 (2d Cir.1984). It is thus apparent that such a privilege would be applied only to protect a scholar's confidential notes or sources and, even then, would be applied only after the scholar had satisfied the threshold showing applicable to the privilege. Concededly, this test is not met here.

Braden argues that this Court should extend the holdings of *Dow Chemical* and *Richards of Rockford* to create a broader privilege under which a donor to an archive would receive the same degree of protection as would a third-party researcher under those cases. However, it is clear that Braden's case is distinguishable from those of the researchers in *Dow Chemical* and *Richards of Rockford.* Not only has Braden not satisfied the threshold showing of such a privilege, but she is asserting her privilege with respect to all of her general files, not with respect to specific confidential academic sources, data or working papers. Furthermore, Braden is not an academician or researcher herself and, unlike in *Dow Chemical* and *Richards of Rockford,* Braden is not an unrelated third-party to the litigation—she is a Vice Chair of NCARL and a member of the plaintiff class. These distinctions are not merely formal; they indicate that the balancing

analysis undertaken by the courts in *Dow Chemical* and *Richards of Rockford* dealt with factors quite different from those in the case at bench. Thus, close analysis does not support extension of the rationale of those cases to create a new privilege that would be applicable here.

This conclusion is reinforced by the fact that the researcher's privilege is by no means universally accepted by other courts. The other cases that have considered the privilege have uniformly declined to adopt it. Some have been generally sympathetic to the privilege, yet have nevertheless held that it could not be applied on the facts of the case. *See United States v. Doe,* 460 F.2d 328, 334 (1st Cir. 1972), *cert. denied,* 411 U.S. 909, 93 S.Ct. 1527, 36 L.Ed.2d 199 (1973). Still others appear to be hostile to the proposed privilege and have declined to adopt it in the first instance. *See, e.g., In re Grand Jury,* 750 F.2d at 224; *Wright v. Jeep Corp.,* 547 F.Supp. 871, 875 (E.D.Mich.1982); *United States v. International Business Mach. Corp.,* 83 F.R.D. 92, 95 (S.D.N.Y.1979).

Therefore, as was the case with Braden's earlier arguments, the cases considering a researcher's privilege are not only distinguishable from the case at hand, but are simply too tenuous to justify a major extension of their rationale to create a wholly novel archival privilege. While it is unnecessary to decide today whether either the researcher's privilege or some form of an academic freedom privilege should be recognized in the appropriate case, on the facts of the case at bench, it is simply too great an extension of the federal common law of privilege to permit mere placement of one's records in an archive to exempt the documents from discovery.

Braden and the amici argue that a holding rejecting their proposed archival privilege will discourage potential donors from placing their private documents in an archive where they will be available for use by scholars. However, I do not believe this to be the case. The Court is *not* striking down the access restriction agreement in its entirety, thereby permitting the govern-

ment or the public to rifle at will through Braden's files. Nor is it permitting a third party to obtain the files for use in some unrelated proceeding. Instead, the situation before the Court is one where a member of the plaintiff class seeks to insulate otherwise discoverable documents from disclosure simply by virtue of the fact that she has placed them in an archive under an agreement restricting access by the general public. In such a case, the access restriction agreement must yield to the judicial process' search for truth.

The Court stresses that the access restriction agreement will still be fully enforceable as against the general public, researchers whom Braden does not wish to have access to the documents and the government, if it merely wishes to search through the files unconnected with specific litigation brought *by* plaintiffs. Braden and other donors will therefore still receive the full protection of their access restriction agreements, with the narrow exception that such restrictions must yield to discovery supervised by the Court.

The incentives that currently induce donors to contribute their documents to archives should not be materially affected by the instant decision. Because a donor's documents would be equally discoverable in an action to which the donor is a party regardless of whether they were stored in a corner of her basement or donated to an archive, no donor will encounter an increased risk of disclosure simply by placing her documents in an archive. Moreover, an archival donor will still receive the additional benefits of preservation, cataloging and storage of the documents for posterity.

Finally, I add that the protection sought here amounts in the end to nothing more than the assertion that the mere act of placing documents in an "archive" should protect it from the judicial process, including discovery. Braden does not contend that the documents sought would be "privi-

leged" if she had retained physical possession of them. The ruling here does no more than hold that the documents are as equally discoverable after they have been deposited in an archive as they would have been had they been retained by the donor.[16] It does not in any way expand their discoverability.

### 3. *Rule 26 Burden.*

Braden's final argument is that even if the Court declines to apply either the First Amendment associational privilege or her proposed archival privilege, the government's request should still be narrowed because it is unduly burdensome and unreasonably cumulative. F.R.Civ.P. 26(b)(1). This argument is unpersuasive and does not deserve extended discussion.

■ Braden is a member of the plaintiff class in a case where there has been massive discovery and document production on both sides. The wrongful acts charged span a period of more than 20 years. Indeed, plaintiff's Freedom of Information Act request has required the government to review over 132,000 pages of documents. (See Decl. of Richard Staver, ¶ 4.) Although plaintiffs have also had to produce large numbers of documents from the files of NCARL and Wilkinson, under Rule 26 the defendants are entitled to obtain discovery of any potentially relevant material.

The Historical Society has prepared an index of the contents of approximately 90 out of the 240 boxes of documents in the Braden Collection and this index states that the files contain at least the following potentially relevant material: frequent correspondence with Wilkinson (Historical Society Index to the Braden Collection, at 6); three boxes of documents pertaining to the House Un-American Activities Committee (*id.* at 20); and additional documents pertaining to NCAHUAC from SCEF's central

---

**16.** By stating that the documents are "equally discoverable" I do not intend to and do not rule on any potential issues raised at the hearing which are not now before me, *e.g.,* whether placement of a document which otherwise would be protected by the attorney-client privilege in an archive and granting "scholars" access to such document results in waiver of the privilege.

office files (*id.* at 30). It is reasonable to assume that there may be other material relevant to this lawsuit in the uncatalogued documents.

Therefore, in light of the scope of discovery on both sides, Braden's status as a class member and the potential for the discovery of relevant material in her files, I hold that defendants' subpoena duces tecum directed to Braden is not unduly burdensome under Rule 26.

■ Plaintiffs also have not made a clear showing that the material in Braden's files is unreasonably cumulative of other material already produced from Wilkinson's and NCARL's files. While some of the documents may already have been produced from other files, there is no showing that the files are necessarily substantially duplicative. Especially in view of the large number of uncatalogued documents in Braden's files, plaintiffs cannot rely on a mere probability or assertion that the documents are unreasonably cumulative.[17]

IT IS ORDERED:

1. Braden's motion for a protective order is denied, except to the extent that the government is restricted in its use of any documents produced by the Protective Order of May 7, 1986.

2. Braden and plaintiffs are granted 30 days within which to inspect the documents in the Braden Collection for the purpose of asserting any claims of privilege on an individualized basis. If any claim of privilege is asserted, within said 30-day period plaintiffs shall furnish defendants with a log describing the document, stating the claim of privilege asserted and briefly describing the basis therefor.

3. Promptly upon the expiration of said 30-day period, Braden shall consent to the

production or copying of all documents in the Braden Collection in the possession of the State Historical Society of Wisconsin[18] to which a specific claim of privilege has not been asserted.

---

17. Plaintiffs also argue that discovery of Braden's files should be postponed until the government has satisfied its own discovery obligations. *See Wilkinson v. FBI,* 633 F.Supp. 336 (C.D.Cal. 1986). However, priority in discovery generally has been abolished, F.R.Civ.P. 26(d), and this is not the proper case in which to order priority.

18. According to the brief of the Wisconsin Attorney General, title to the documents in the Bra-

den Collection is held by the Historical Society as trustee for the state. Amicus Brief of Bronson C. LaFollette, at 3–4. Thus, while he asserts that Braden consequently cannot be ordered to produce the documents directly, as she has neither possession nor title to them, he states that an order requiring her to consent to inspection or production of copies would be effective to secure discovery. *Id.*