138 P.3d 1053 (2006)
T.S., M.S. and K.S., Respondents,
v.
BOY SCOUTS OF AMERICA, a congressionally chartered corporation, authorized to do business in Washington, Petitioner, and
Pacific Harbors Council, Boy Scouts of America, formerly known as Mount Rainier Council, a Washington public benefit corporation; Chief Seattle Council, Boy Scouts of America, a Washington public benefit corporation; and Bruce Phelps, an individual, Defendants.
No. 76726-2.
Supreme Court of Washington, En Banc.
Argued October 11, 2005.
Decided July 27, 2006.
*1054 D. Michael Reilly, Steven Douglas Jensen, Michael Barr King, Laura Therese Morse, Lane Powell PC, Michael Thomas Pfau, Mark Gregory Honeywell, Joan C. Foley, Timothy David Kosnoff, Gordon Thomas Honeywell, Seattle, for Petitioner/Appellant.
Mary Colleen Kinerk, Cable Langenbach Kinerk Bauer LLP, Kenneth Scott Kagan, Carney Badley Spellman, Seattle, for Appellee/Respondents.
OWENS, J.
¶ 1 T.S., M.S., and K.S. filed suit against the Boy Scouts of America (BSA), two local BSA councils, and former scoutmaster Bruce Phelps, seeking damages for sexual abuse allegedly committed by Phelps in the 1970s and 1980s when plaintiffs were scouts. BSA seeks reversal of a discovery order requiring production of its "Ineligible Volunteer Files" (the Files), a compilation of reports that BSA received over a period of decades regarding, primarily, allegations of the sexual abuse of minors by adult men. Clerk's Papers (CP) at 76. Asserting the privacy rights of third parties named in the Files, BSA contends that the trial court abused its discretion when it failed to follow the balancing test that this court had previously prescribed for weighing a political party's "First Amendment associational privilege" against a discovery request for disclosure of the party's minutes. Snedigar v. Hodderson, 114 Wash.2d 153, 158, 786 P.2d 781 (1990).
¶ 2 We conclude that the trial court was not required to apply the Snedigar balancing test when considering BSA's claim that disclosure of the Files would violate a constitutional right to privacy. Finding no abuse of discretion in the trial court's denial of BSA's motion for a protective order, we affirm the trial court.

FACTS
¶ 3 Plaintiffs T.S. and M.S. filed a complaint for damages in November 2003 against BSA, two local BSA councils, and former scoutmaster Bruce Phelps,[1] alleging that for the 12-year period from 1971 to 1983, Phelps repeatedly sexually abused them. Plaintiffs' complaint states a cause of action against all defendants for negligent infliction of emotional distress.[2] The complaint also asserts that the BSA defendants negligently retained and supervised Phelps and breached their fiduciary duty. Specifically, plaintiffs contend that the BSA defendants were negligent in "[f]ailing to timely adopt policies and procedures to protect children." CP at 34. Pursuant to an additional cause of action for estoppel and fraudulent concealment, plaintiffs claim that the BSA defendants "engaged in a plan of action to cover up incidents of the sexual abuse of minors by scout leaders and prevent disclosure, prosecution and civil litigation including, but not limited to: failure to report incidents of abuse to law enforcement or child protection agencies, concealment of abuse it had substantiated and failure to seek out and redress the injuries its scout leaders had caused." Id. at 35.
¶ 4 During the course of discovery, plaintiffs sought production of "copies of all `Ineligible Volunteer Files' or similar documents or files regarding sexual abuse or abuse kept or maintained by BSA," along with "all documents which describe or explain the `Ineligible Volunteer Files.'" Id. at 57. According to the declaration of BSA's director of registration, *1055 "[s]ince the beginning of the scouting movement," BSA has collected and maintained the Files "regarding individuals who do not meet the membership requirements of BSA." Id. at 76. The stated purpose of the system is "to collect information in an attempt to prevent any individual that does not meet the high standards of BSA from being able to register within any scouting organization elsewhere." Id. at 77. When BSA receives a complaint, "a file is immediately set up." Id. The director of registration acknowledges that a file could be initiated "by nothing more than unsubstantiated rumors, hearsay, or news items" and that the "BSA conducts no internal investigation." Id. BSA has confirmed that, "prior to plaintiffs' complaint, there was no Ineligible Volunteer File relating to Bruce Phelps." Id. at 78. While the director of registration estimated that the total number of files in existence exceeded 2,000, BSA has elsewhere suggested that the number may be closer to 10,000. Plaintiffs' counsel has acquired access from a California attorney to approximately 1,900 files initiated between 1971 and 1990 and not protected by a court order in the prior civil litigation.
¶ 5 BSA moved the trial court for a protective order confirming that BSA was not required to make any further response to production requests concerning the Files. BSA argued that it should not be required to comply with plaintiffs' requests because the Files were irrelevant (in that none pertained to Phelps or to any individual connected to a fact at issue), compliance would be unduly burdensome, and "most importantly . . . the files and related information are highly confidential." Id. at 54. As to the last point, BSA asserted that production of the information would violate the "privacy rights" of third parties, including "(1) the scout leaders accused of sexual wrongdoing, (2) the complainants, (3) the witnesses, and (4) the alleged victims." Id. at 63. Of particular concern were "the alleged victims of sexual abuse (many of whom are minors) and the scout volunteers accused, but not convicted, of sexual misconduct." Id. at 54. The director of registration stated that BSA considered the Files "confidential, both with regard to persons outside of BSA as well as with regard to persons inside the organization":
BSA recognizes the sensitive nature of the information within these files, and a file is only made available to persons within the organization on a need-to-know basis. The reasons for the strong confidentiality restrictions are the privacy interest of any victims, the privacy interests of the accused individuals, and the privacy interests of other persons who may be involved as witnesses or reporters of the event.
Id. at 77-78. In addition to expressing concern for the violation of the privacy rights of third parties, the director of registration confirmed that "BSA [was] concerned that divulging this information under any circumstances [would] inhibit future reports of misconduct." Id. at 78.
¶ 6 Responding to BSA's motion, plaintiffs defined the issue as not whether BSA had prior knowledge that Phelps himself posed a risk or whether BSA now acknowledges that other scoutmasters have sexually abused scouts, but rather whether BSA was aware (or should have been aware) of the extent of the pedophilia threat during the period at issue here (1971 to 1983) and whether BSA's policies and procedures were timely and effective responses to the threat. Because BSA's "Youth Protection Program," which aimed at educating parents and scouts of the pedophilia threat, postdates the events giving rise to plaintiffs' claims here, plaintiffs maintain that the Files are essential to defining the severity of the known pedophilia threat in the 1970s and early 1980s and to evaluating the degree of care that BSA exercised in meeting it. Juarez v. Boy Scouts of Am., Inc., 81 Cal.App. 4th 377, 392, 97 Cal.Rptr.2d 12 (2000) (stating that implementation of BSA's "Youth Protection Program" occurred in 1987). Plaintiffs therefore asked the court to deny BSA's motion for a protective order and instead require BSA to produce the requested documents, redacting information identifying the victims.
¶ 7 The trial court signed an order on September 27, 2004, denying BSA's motion and imposing the following requirements:
BSA is ordered to forthwith produce those files (not already in plaintiffs' counsel's *1056 possession and identified in plaintiffs' response) for inspection and copying by plaintiffs' counsel, and all alleged victims' names shall be redacted from the documents copied. Alleged perpetrators' names shall also be redacted, and identifying numbers or codes may be substituted for such names. Identifying numbers or codes shall be individual to each alleged perpetrator, so that any alleged multiple offenders can be identified.
....
... Counsel shall cooperate in drafting an appropriate protective order limiting the viewing of these documents to counsel and their designated assistants, identifying all such individuals, and prohibiting the distribution or publication of all such documents.
CP at 669-70. BSA moved for reconsideration or, pursuant to RAP 2.3(b)(4), certification of the issue for discretionary review. The trial court denied both reconsideration and certification.
¶ 8 BSA filed a motion for discretionary review in Division One of the Court of Appeals, contending that the trial court's order requiring disclosure of the Files constituted "probable error" under RAP 2.3(b)(2). Renewing its argument that the trial court's order violated the privacy rights of third parties, BSA cited the protection afforded in article I, section 7 of the Washington State Constitution.[3] In response, plaintiffs raised the threshold issue of BSA's standing to assert the rights of third parties and disputed the notion that the state constitutional privacy protection should preclude civil discovery of the Files. Commissioner Neel heard argument on December 3, 2004, and on December 8 entered an order granting discretionary review and setting a briefing schedule. Plaintiffs timely filed a motion to modify Commissioner Neel's ruling. While awaiting a decision on that motion, the parties completed their briefing. On February 9, 2005, a panel of the Court of Appeals granted the motion to modify and denied BSA's motion for discretionary review. BSA then filed an emergency motion to modify, but that motion was denied.
¶ 9 In an emergency motion filed thereafter in this court, BSA asked the court to grant discretionary review "for the purpose of reinstating BSA's appeal and resolving the issues raised by that appeal." BSA's Emergency Mot. for Discretionary Review at 20 (emphasis added). Applying the RAP 2.3(b) criteria, this court's commissioner ruled that interlocutory review of the superior court's discovery order was not warranted. Nevertheless, we thereafter granted BSA's motion to modify and its motion for discretionary review, effectively reinstating and retaining BSA's appeal,[4] for which the parties' briefing had already been completed below. The Washington State Trial Lawyers Association Foundation filed an amicus brief, and BSA responded.

ISSUE
¶ 10 In responding to BSA's motion for a protective order under CR 26(c),[5] did the trial court abuse its discretion by failing to apply the Snedigar balancing test to BSA's claim that disclosure of the Files would violate the privacy rights of third parties named in the Files?

ANALYSIS
¶ 11 Standard of Review. An appellate court reviews a trial court's discovery order for an abuse of discretion. John Doe v. Puget Sound Blood Ctr., 117 Wash.2d 772, 778, 819 P.2d 370 (1991). Judicial discretion *1057 "means a sound judgment which is not exercised arbitrarily, but with regard to what is right and equitable under the circumstances and the law, and which is directed by the reasoning conscience of the judge to a just result." State ex rel. Clark v. Hogan, 49 Wash.2d 457, 462, 303 P.2d 290 (1956). An appellate court will find an abuse of discretion only "on a clear showing" that the court's exercise of discretion was "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). A trial court's discretionary decision "is based `on untenable grounds' or made `for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." State v. Rohrich, 149 Wash.2d 647, 654, 71 P.3d 638 (2003). A court's exercise of discretion is "`manifestly unreasonable'" if "the court, despite applying the correct legal standard to the supported facts, adopts a view `that no reasonable person would take.'" Id. (quoting State v. Lewis, 115 Wash.2d 294, 298-99, 797 P.2d 1141 (1990)).
¶ 12 Applicability of the Snedigar Balancing Test to BSA's Request for a Protective Order under CR 26(c). Under CR 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." (Emphasis added.) As a further limitation on discovery, the trial court, "[u]pon motion by a party or by the person from whom discovery is sought, and for good cause shown, ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." CR 26(c) (emphasis added). In drafting a protective order under CR 26(c), the trial court may order "that the discovery not be had" at all, or it may place conditions or limitations on the requested discoveryfor example, by specifying the time or place, restricting the scope of inquiry, or designating the persons who may be present. CR 26(c)(1), (2), (4), (5).
¶ 13 Here, the trial court's discovery order denied BSA's request for a protective order that would have provided, pursuant to CR 26(c)(1), "that the discovery [of the Files] not be had,"[6] but the court's discovery order did require, not simply the redaction of the alleged victims' names, as plaintiffs had requested, but also the redaction of the "[a]lleged perpetrators' names." CP at 669. The order thus mandated some CR 26(c) protective measures and additionally required that, in cooperatively drafting the protective order, the parties incorporate a provision "limiting the viewing of these documents to counsel and their designated assistants, identifying all such individuals, and prohibiting the distribution or publication of all such documents." CP at 670.
¶ 14 Seeking reversal of the trial court's discovery order, BSA claimed in its opening brief that the trial court abused its discretion by failing to extend the balancing test called for in Snedigar, 114 Wash.2d 153, 786 P.2d 781, to plaintiffs' request for production of the Files. In BSA's view, because the Snedigar court had imposed a balancing test for weighing a political party's qualified First Amendment associational privilege against a plaintiff's entitlement to discovery under CR 26, the trial court here should have applied the same balancing test when measuring BSA's assertion of the article I, section 7 privacy rights of third parties against plaintiffs' right to civil discovery of the Files. To be fair to the trial court, we recognize at the outset that both article I, section 7 and the Snedigar balancing test were latecomers to BSA's arguments resisting discovery. BSA's motion for a protective order alluded to the right of privacy under the federal constitution, *1058 but BSA did not mention the state constitutional provision in that motion or the motion for reconsideration; in fact, BSA first referred to article I, section 7 in a footnote in its motion for discretionary review, and BSA's assertion of the applicability of the Snedigar balancing test was made still later in its reply brief. In sum, the trial court was not asked to apply the legal standard that BSA has since made the cornerstone of its appeal.
¶ 15 To evaluate the soundness of BSA's equation of the associational privilege at issue in Snedigar with the article I, section 7 protections that BSA asserts here, we begin with a review of the development and application of the Snedigar balancing test. The test that this court adopted in Snedigar had its genesis in the Court of Appeals decision, Snedigar v. Hodderson, 53 Wash.App. 476, 768 P.2d 1 (1989). Richard Snedigar, a former member of the Freedom Socialist Party, filed suit to recover a monetary contribution made in response to the Party's solicitation of funds for a new headquarters. The trial court granted Snedigar's motion to compel discovery of the minutes of relevant meetings, requiring that they be submitted for in camera inspection but permitting redaction of the names of Party members. Appealing to Division One of the Court of Appeals, the Party argued that the discovery order violated the Party's First Amendment rights. In the absence of Washington case law directly on point, the Court of Appeals relied on Wilkinson v. FBI, 111 F.R.D. 432 (C.D.Cal. 1986). In Wilkinson, the federal district court discussed the applicability of "a qualified First Amendment associational privilege in the context of discovery." Id. at 436 (emphasis added). Having reviewed the limited case law, the Wilkinson court observed that "the First Amendment associational privilege has been applied only in situations where the discovery request specifically required disclosure of the names of a group's members or financial contributors"  "information at the core of the group's associational activities." Id. at 437, 436. As the court explained, once a litigant established "that the discovery request [was] directed at the heart of a group's protected associational activities, the court is required to subject the request to a higher level of scrutiny." Id. at 436. Because the associational privilege is not absolute, a court faced with a discovery dispute must rely on a balancing test, "essentially requiring both a heightened degree of relevance to the subject matter of the suit and a showing by the party seeking discovery that it has made reasonable, unsuccessful attempts to obtain the information elsewhere." Id.
¶ 16 The Court of Appeals considered alongside Wilkinson two decisions from this court that had "used an analysis similar to that described in Wilkinson to determine whether a reporter's qualified common law privilege against compulsory disclosure of news sources should provide protection from discovery requests." Snedigar, 53 Wash. App. at 482, 768 P.2d 1 (emphasis added). In Senear v. Daily Journal-American, 97 Wash.2d 148, 641 P.2d 1180 (1982), this court determined that reporters had a qualified common law privilege in civil litigation, but that the privilege could be defeated if the party seeking disclosure could show that the claim was meritorious, that the information being sought went "`to the heart of the plaintiff's claim,"' and that "a reasonable effort [had been] made to acquire the desired information by other means"; additionally, the court must find that the reporter "need[ed] to preserve confidentiality." Id. at 155-56, 641 P.2d 1180 (quoting Garland v. Torre, 259 F.2d 545, 550 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958)). In State v. Rinaldo, 102 Wash.2d 749, 754-55, 689 P.2d 392 (1984), this court extended the qualified privilege for news reporters to criminal cases and endorsed as well the Senear court's criteria for defeating the privilege. Id. at 755-58, 689 P.2d 392.
¶ 17 Relying on the federal courts' application of a qualified First Amendment associational privilege to discovery requests, as well as on this court's analogous application of a qualified privilege for news reporters resisting discovery, the Court of Appeals adopted the following three-step test to determine whether the Party's assertion of a First Amendment associational privilege would *1059 protect its minutes from Snedigar's civil discovery request:
First, the party asserting the privilege must make an initial showing that disclosure of the materials requested would in fact impinge on First Amendment rights. . . .
Once this preliminary showing of privilege is made, the burden then shifts to the party seeking discovery to establish the relevancy and materiality of the information sought, and to make a showing that reasonable efforts to obtain the information by other means have been unsuccessful. . . .
If this burden is met, it is for the trial court to balance the parties' competing claims of privilege and need. At this stage, the trial court may order an in camera inspection of the requested information to better ascertain the strength of the parties' competing claims, and decide whether, and to what extent, discovery of the requested materials is appropriate.
Snedigar, 53 Wash.App. at 483, 768 P.2d 1. This court subsequently embraced this three-part balancing test but with one change; although the Court of Appeals had required a threshold showing of "actual infringement," this court held that "[t]he party asserting the First Amendment associational privilege is only required to show some probability that the requested disclosure will harm its First Amendment rights." Snedigar, 114 Wash.2d at 158, 786 P.2d 781.
¶ 18 That the Snedigar balancing test applies to a privilege asserted by a party resisting a discovery request  and was, in fact, derived from cases defining privileges against compliance with discovery requests  is of considerable significance in determining whether a trial court must use the Snedigar balancing test when a party resists disclosure by asserting, not a particular statutory, common law, or constitutional privilege, but a general right to privacy under article I, section 7. When a trial court considers a discovery request under CR 26(b)(1), the court considers the relevance of the requested discovery only after making the threshold determination of whether a privilege shields the matter from disclosure: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." (Emphasis added.) Washington commentators have explained that "[p]rivilege, within the meaning of the Rule, is privilege as it exists in the law of evidence." 4 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 26, at 28 (4th ed.1992). For example, among the privileges included in the nonexclusive list in ER 501 are the statutory attorney-client, doctor-patient, priest-penitent, and psychologist-client privileges, as well as the statutory spousal privilege and the common law news reporter's privilege. As this court observed in State v. Maxon, 110 Wash.2d 564, 756 P.2d 1297 (1988), "[p]rivileges are recognized when certain classes of relationships, or certain classes of communications within those relationships, are deemed to be so important to society that they must be protected, even at the expense of the fact-finding process in criminal investigations and prosecutions." Id. at 567, 756 P.2d 1297 (emphasis added).
¶ 19 As with the evidentiary privileges identified in ER 501, the qualified First Amendment associational privilege at issue in Snedigar protects a particular type of relationship  the relationship between a political party and its membership  and the communications "at the core of" that relationship. Wilkinson, 111 F.R.D. at 436. The qualified associational privilege afforded a political party and its membership thus bears a strong resemblance to the evidentiary privileges circumscribing discovery under CR 26(b)(1). In contrast, the BSA-informant privilege does not exist in the law of evidence, nor are the communications hypothetically protected by a BSA-informant privilege in any way comparable to those "deemed to be so important to society that they must be protected, even at the expense of the fact-finding process in criminal investigations and prosecutions." Maxon, 110 Wash.2d at 567, 756 P.2d 1297. Indeed, the opposite is true: a society interested in protecting children from criminal assaults would not reasonably leave to the discretion of a children's social club the disclosure of information regarding criminal assaults on children. In sum, BSA's *1060 assertion of the privacy interests of third parties cannot be construed as the assertion of a "privilege" within the meaning of CR 26(b)(1).
¶ 20 While the Snedigar court restricted its focus to the protectiveness of a particular qualified privilege (and did not place that inquiry in the broader context of CR 26),[7] we demonstrated in Doe, 117 Wash.2d 772, 819 P.2d 370, a case decided almost two years after Snedigar, that the applicability of recognized privileges is a threshold matter for the trial court under CR 26(b)(1) and that the court thereafter weighs a resisting party's asserted privacy interests pursuant to CR 26(c). That we did not view the assertion of privacy claims as an assertion of a privilege is made clear in our Doe opinion. There, in part II, "Privilege," we addressed the Blood Center's asserted privileges in two subsections, "Physician-Patient Privilege" and "Common Law [Donor-Blood Bank] Privilege." Id. at 779-80, 819 P.2d 370. We included the privacy claims in part III, which we entitled "The Interests Involved" and which included subsections that identified the components of "the trial court's exercise of discretion under CR 26(c)": "Plaintiff's Interests," "Right of Privacy [Claimed by the Blood Center]," and "Public Policy." Id. at 780-89, 819 P.2d 370. The Doe opinion thus showed that, if a trial court finds under CR 26(b)(1) no applicable privileges (and also concludes that the information sought is "relevant"  that is, "reasonably calculated to lead to the discovery of admissible evidence"), the court may then entertain a motion for a protective order under CR 26(c) and "for good cause shown . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, [or] oppression."
¶ 21 The Doe court's inclusion of the Blood Center's constitutional privacy claims within the section of the opinion addressing the trial court's exercise of discretion under CR 26(c) can leave no doubt that the trial court, when considering a CR 26(c) motion, weighs the asserted privacy interests against the needs of the litigant seeking disclosure. Consistent with the approach endorsed in Doe, this court had previously recognized the presumption in CR 26(c) that discovery opens "[a] realm of privacy which courts had previously left undisturbed," and we had explicitly stated that the trial court's weighing of those privacy interests is inherent in CR 26(c):
In determining whether a protective order is needed and appropriate, the court properly weighs the respective interests of the parties. The judge's major concern should be the facilitation of the discovery process and the protection of the integrity of that process, which necessarily involves consideration of the privacy interest of the parties and, in the ordinary case at least, does not require or condone publicity.
Rhinehart v. Seattle Times Co., 98 Wash.2d 226, 236, 256, 654 P.2d 673 (1982) (emphasis added). Reiterating this point, the United States Supreme Court had likewise recognized prior to Doe that, "[a]lthough [CR 26(c)] contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 n. 21, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); see also Howell v. Spokane & Inland Empire Blood Bank, 117 Wash.2d 619, 629, 818 P.2d 1056 (1991) (observing that, "[u]nder CR 26(c), a judge is given broad discretion in fashioning discovery orders in order to protect a person's privacy").

CONCLUSION
¶ 22 We hold that, in weighing BSA's assertion that the compelled discovery of the Files under CR 26 would violate the constitutional privacy rights of third parties named in the Files, the trial court was not required to apply the balancing test set forth in Snedigar for assessing a party's qualified First Amendment associational privilege. The article I, section 7 "private affairs" protection asserted by BSA is not a "privilege" within the meaning of Snedigar or CR 26(b)(1) but *1061 rather is a privacy interest that the trial court necessarily evaluates when considering a motion for a protective order under CR 26(c). Because BSA has not shown that the trial court's decision to deny BSA's motion for a protective order "was reached by applying the wrong legal standard," we find no abuse of discretion. Rohrich, 149 Wash.2d at 654, 71 P.3d 638. The trial court's discovery order is affirmed.
Concurring: C.J. ALEXANDER, C. JOHNSON, MADSEN, BRIDGE, CHAMBERS, FAIRHURST, JJ.
SANDERS, J. (dissenting).
¶ 23 While the majority recognizes the First Amendment implicit right of free association creates at least a qualified privilege against pretrial discovery on associational matters, it refuses to enforce a similar privilege emanating from our state constitutional right to privacy, Wash. Const. art. I, § 7. I cannot understand the reason for the distinction, and the majority doesn't tell us.
¶ 24 If anything article I, section 7 is more directly related to pretrial discovery than is the First Amendment:
No person shall be disturbed in his private affairs, or his home invaded, without authority of law.
Const. art. I, § 7.
¶ 25 This text plainly requires us to question whether the requested discovery implicates one's "private affairs" and, if so, whether it is compelled under "authority of law." On the other hand, the majority's recognition of a First Amendment qualified privilege against discovery requires much more judicial footwork:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.
U.S. Const. amend. I.
¶ 26 Although construing the First Amendment to create a qualified privilege against disclosure of associational matters may well be implicit, it is certainly not explicit. Nevertheless we recognized it, and applied it, in Snedigar v. Hoddersen, 114 Wash.2d 153, 786 P.2d 781 (1990).
¶ 27 The majority's discussion of CR 26(b)(1) is somewhat beside the point as this rule on its face provides no authority to obtain discovery of a privileged matter ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter. . . .") (emphasis added).
¶ 28 The nub of the majority's analysis of whether or not article I, section 7 creates a privilege of nondisclosure follows:
That the Snedigar balancing test applies to a privilege asserted by a party resisting a discovery request  and was, in fact, derived from cases defining privileges against compliance with discovery requests  is of considerable significance in determining whether a trial court must use the Snedigar balancing test when a party resists disclosure by asserting, not a particular statutory, common law, or constitutional privilege, but a general right to privacy under article I, section 7.
Majority at 1059.
¶ 29 It is stupefying to hold that there is at least a qualified privilege against disclosure created by the First Amendment while dismissing the much more pertinent and explicit text of article I, section 7 as "but a general right to privacy under article I, section 7." Id. at 1059. Article I, section 7 is as much a part of our state constitution as the First Amendment is part of its federal counterpart, and there is even more reason to protect a broad or "general right" to privacy than a narrow one. I suggest a more searching and principled approach to the problem will further illuminate the majority's shortcomings.

I.

Article I, Section 7 Provides Citizens Broad Protections From Unreasonable Interference
¶ 30 It is evident from the constitutional text, framers intent, and case law expounding it, article I, section 7 indeed provides broad protections to the people of our state.
*1062 ¶ 31 "Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997). Under this well-established principle of constitutional interpretation we are bound by the broad language in article I, section 7 declaring that "private affairs" are entitled to protection, and must give full effect to that constitutional mandate.
¶32 Our framers stated the standard for interpreting our constitution is the constitution itself. Article I, section 29 provides: "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." Mr. Justice Joseph Story articulated the proper approach to constitutional interpretation:
In the first place, then, every word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them; the people adopt them, the people must be supposed to read them, with the help of common-sense; and cannot be presumed to admit in them any recondite meaning, or any extraordinary gloss.
1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 451, at 322 (Little Brown & Co. ed., 3d ed. 1858) (quoted in Malyon, 131 Wash.2d at 799 n. 31, 935 P.2d 1272).

A. Intent of Washington Constitution Framers
¶ 33 It is also our fundamental rule of constitutional interpretation that courts are "to look to the right as it existed at the time of the constitution's adoption in 1889." Sofie v. Fibreboard Corp., 112 Wash.2d 636, 645, 771 P.2d 711 (1989); see also City of Pasco v. Mace, 98 Wash.2d 87, 99, 653 P.2d 618 (1982) (affirming right to jury trial in municipal court because "[f]rom the earliest history of this state, the right of trial by jury has been treasured"). At the constitutional convention in 1889 some delegates proposed Washington adopt language identical to the Fourth Amendment. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 497 (Beverly Paulik Rosenow ed., 1962). However, the Founders expressly rejected this language, instead "the convention adopted a strikingly different provision that does not expressly refer to searches, seizures, and warrants but does emphasize the individual's privacy rights." ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 20-21 (2002).
¶ 34 Our Founding Fathers recognized one's privacy deserved heightened protection exceeding the Fourth Amendment, favoring a broader constitutional directive explicitly protecting our citizens' private affairs; whereas the United States Constitution never even mentions privacy. So doing, the framers created a "broad and inclusive privacy protection." See, e.g., Sanford E. Pitler, Comment, The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy, 61 WASH. L. REV. 459, 520 (1986). Contemporaneous accounts describe the framers of article I, section 7 as having made private affairs "sacred." THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, supra, at 497 n. 14.
¶ 35 The framers recognized the basic principle that the right to privacy is among the most fundamental of all rights to protect what Justice Brandeis famously stated nearly a century ago, "[T]he right to be let alone [is] the most comprehensive of rights and the right most valued by civilized men." Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

B. Washington Precedent is Consistent with the Framers' Intent
¶ 36 We approvingly cited Justice Brandeis when recognizing "the overriding necessity for the protection of privacy interests in certain *1063 governmental contexts  such as those involved in discovery proceedings." Rhinehart v. Seattle Times Co., 98 Wash.2d 226, 240, 242, 654 P.2d 673 (1982), aff'd, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Further, we declared over 25 years ago that article I, section 7 "clearly recognizes an individual's right to privacy with no express limitations." State v. Simpson, 95 Wash.2d 170, 178, 622 P.2d 1199 (1980).
¶ 37 Since then the great weight of Washington appellate authority has favored giving full meaning to article I, section 7's express textual mandate that "private affairs" shall be protected against unwarranted intrusion, whatever the source. See, e.g., State v. Christensen, 153 Wash.2d 186, 200, 102 P.3d 789 (2004) (recognizing "Washington's longstanding tradition of affording great protection to individual privacy"); State v. Jackson, 150 Wash.2d 251, 259, 76 P.3d 217 (2003) ("It is now settled that article I, section 7 is more protective than the Fourth Amendment."); State v. McKinney, 148 Wash.2d 20, 26, 60 P.3d 46 (2002) ("It is now well settled that the protections guaranteed by article I, section 7 of the state constitution are qualitatively different from those provided by the Fourth Amendment. . . ."); State v. Ladson, 138 Wash.2d 343, 348-49, 979 P.2d 833 (1999) ("Article I, section 7, is explicitly broader than that of the Fourth Amendment as it `clearly recognizes an individual's right to privacy with no express limitations' and places greater emphasis on privacy.") (quoting State v. Young, 123 Wash.2d 173, 180, 867 P.2d 593 (1994) (footnote and internal quotation marks omitted)); State v. Bradley, 105 Wash.App. 30, 36, 18 P.3d 602, 27 P.3d 613 (2001) (article I, section 7 "provides greater protection to an individual's right of privacy than the Fourth Amendment").
¶ 38 In sum, it is clearly evident from the text, framers intent, and resulting precedent, article I, section 7 provides broad protection to citizens of this state, and we must apply it accordingly.

II.

Does Disclosure in this Case Invoke "Private Affairs"?
¶ 39 To determine whether Washington's broad constitutional protection of privacy is infringed in this case, the court must determine whether the information contained within the ineligible volunteer files falls within the ambit of article I, section 7's "private affairs" protection. If so, at least the Snedigar balancing test should be employed to protect privacy, as it has been used to protect free association.

A. The Ineligible Volunteer Files System
¶ 40 To assist local scouting programs to avoid using volunteers who do not meet Scouting standards, the Boy Scouts of America (BSA) at its inception implemented a system to maintain files on individuals who may not meet those standards. Clerk's Papers (CP) at 76-77, ¶ 3. While many of the ineligible volunteer files concern individuals accused of committing sexual abuse, they are also maintained for individuals accused of other indiscretions (e.g., physical assault, theft, alcohol/drug abuse). CP at 54. Ineligible volunteer files are sometimes generated from unsubstantiated rumors, hearsay, or news items. CP at 77, ¶ 3. The BSA often has no actual knowledge of whether an alleged violation occurred. Id. BSA estimates that it has control over approximately 10,000 ineligible volunteer files at present. CP at 680 n. 2.
¶ 41 BSA's director of registration has the duty to safeguard and maintain the ineligible volunteer files system. CP at 77. BSA's director of registration recognizes the sensitive nature of the files and declared:
BSA considers the information in the Ineligible Volunteer Files to be confidential, both with regard to persons outside of BSA as well as with regard to persons inside the organization. BSA recognizes the sensitive nature of the information within these files, and a file is only made available to persons within the organization on a need-to-know basis. . . .
CP at 77-78, ¶ 8.

B. Information Contained in the Ineligible Volunteer Files Are "Private Affairs" Under Article I, Section 7
¶ 42 The only nationally reported decision dealing with the production of ineligible volunteer *1064 files involved facts nearly identical to the present case  claims of sexual molestation by BSA scoutmasters: Juarez v. Boy Scouts of America, Inc., 81 Cal.App.4th 377, 97 Cal.Rptr.2d 12 (2000). Because California's Constitution is textually less demanding than Washington's,[1] a consistent analysis would certainly conclude that we should afford privacy rights under our text no less protection than California affords under its constitution.
¶ 43 Although Juarez provides persuasive legal analysis regarding the same issue as the instant case, the majority fails to address, distinguish, and/or dismiss Juarez in any manner whatsoever.
¶ 44 In 1996 Mario Juarez sued BSA, the San Francisco Bay Area Council, and the Mary Help of Christians Church of the Roman Catholic Diocese of Oakland, seeking damages for sexual molestation committed by Jorge Francisco Paz, Juarez's scoutmaster. Juarez, 81 Cal.App.4th at 384, 97 Cal. Rptr.2d 12.
¶ 45 During discovery BSA produced the ineligible volunteer file for Paz after Juarez's allegations came to light. Id. at 390-91, 97 Cal.Rptr.2d 12. Juarez, however, sought discovery of all BSA ineligible volunteer files for persons accused of sexual misconduct. BSA sought a protective order, arguing that the ineligible volunteer files were protected by the state constitutional right of privacy, and no compelling need had been shown for the discovery of the files, which were of dubious relevance at best to Juarez's claims. In response the court appointed a referee to conduct an in camera review of certain ineligible volunteer files to determine the discoverability of such files. After reviewing a redacted sample, the referee concluded "`these files contain private information and are the type of files that are subject to protection by the right of privacy.'" Id. at 391, 97 Cal.Rptr.2d 12.
¶ 46 On appeal Juarez never disputed that the information contained in the ineligible volunteer files fell manifestly within the constitutionally protected area of privacy. Juarez wisely avoided that argument because, as the court stated,
[S]uch an argument would be futile. Clearly, these files relate to the most private affairs of various individuals unrelated to this litigation and were maintained in strictest confidence by the Scouts. Because the requested material is constitutionally protected, the ordinary yardstick for discoverability, i.e., that the information sought may lead to relevant evidence, is inapplicable.

Id. at 391-92, 97 Cal.Rptr.2d 12 (emphasis added).
¶ 47 Juarez held contents of the ineligible volunteer files contain private information confidentially maintained and is therefore protected by the constitutional provisions of the state constitution. Juarez is directly on point.
¶ 48 In addition to the persuasive authority of Juarez, Washington case law holds "`[W]hat is voluntarily exposed to the general public' is not considered part of a person's private affairs," State v. Goucher, 124 Wash.2d 778, 784, 881 P.2d 210 (1994) (quoting Young, 123 Wash.2d at 182, 867 P.2d 593). Conversely, what is withheld from the public is private. State v. Clark, 129 Wash.2d 211, 227, 916 P.2d 384 (1996). These confidential files contain reports of possible violations of scouting standards, including sexual abuse of minors by adults. These reports also contain information about victims, alleged perpetrators, witnesses, and reporters. Such information is exactly the type of information the framers of article I, section 7 intended to protect from unreasonable intrusions. If this isn't "private," what is?

C. Fidelity to the Constitution's Text Requires that Article I, Section 7's Express Protection of Private Affairs Must Be Held Paramount to Newly Established Discovery Rules
¶ 49 Washington's constitution means today what it meant in 1889. Sofie, 112 *1065 Wash.2d at 645, 771 P.2d 711. Our constitutional protection of private affairs has existed for over 100 years, much longer than pretrial discovery. Pretrial discovery is a "relatively recent innovation" which is traceable to the Federal Rules of Civil Procedure adopted in 1938 nearly 50 years after the Washington Constitution was ratified. Bryan P. Harnetiaux et al., Harnessing Adversariness in Discovery Responses: A Proposal for Measuring the Duty to Disclose After Physicians Insurance Exchange & Ass'n v. Fisons Corporation, 29 GONZ. L. REV. 499, 508 (1994). See Michael E. Wolfson, Addressing the Adversarial Dilemma of Civil Discovery, 36 CLEV. ST. L. REV. 17, 20 (1988) (undertaking historical analysis of roots of modern discovery).
¶ 50 Washington adopted its current system in 1967 patterned on the federal model. See Adoption of Civil Rules for Superior Court, 71 Wash.2d xxii-xxv (1967); see also, Harnetiaux, 29 Gonz. L.Rev. at 508.[2] At common law discovery was very limited and did not include the wide-ranging discovery rules like the newly created CR 26:
At common law opportunities for discovery were limited, as a result of which it was often said that trials were conducted "by ambush." Propounding interrogatories and obtaining documents were not authorized. Some discovery was allowed in equity, but it did not come into its full flower until the promulgation of the federal rules and the adoption of these rules by the states. It is not disputed that without CR 26 the petitioners would have no right of access to the information which they claim a constitutional right to publish.
Rhinehart, 98 Wash.2d at 231-32, 654 P.2d 673 (citations omitted).
¶ 51 Similarly, in John Doe v. Puget Sound Blood Center, 117 Wash.2d 772, 819 P.2d 370 (1991), in response to Justice Dore's dissent claiming "privacy rights must give way at times to the greater societal good of providing civil redress," our majority reaffirmed:
The dissent asserts that once a plaintiff meets "the requirements of CR 26(b)(1) (relevance and nonprivileged subject matter), the issue of privacy drops out of the case as a matter of law." Dissent[ at 789, 819 P.2d 370]. The dissent misses the entire point. The right of privacy would make the matter privileged.

Id. 7at 89, 819 P.2d 370, App. (emphasis added).
¶ 52 Here, the majority misses the same point. The right to private affairs makes the matter privileged. Consistently, CR 26 precludes discovery of constitutionally privileged matters.

D. Since the Ineligible Volunteer Files Information Is Constitutionally Protected, at Minimum the Trial Court Should Have Applied the Snedigar Test
¶ 53 A literalist approach to the constitution might entirely bar the discovery as it appears to be an absolute prohibition against disturbing one in his private affairs except under "authority of law." Modern cases hold that authority of law is a warrant. For example, in Ladson, 138 Wash.2d at 348-49, 979 P.2d 833, we held:
Article I, section 7, is explicitly broader than that of the Fourth Amendment as it "`clearly recognizes an individual's right to privacy with no express limitations'" and places greater emphasis on privacy. State v. Young, 123 Wash.2d 173, 180, 867 P.2d 593 (1994). Further, while the Fourth Amendment operates on a downward ratcheting mechanism of diminishing expectations of privacy, article I, section 7, holds the line by pegging the constitutional standard to "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." State v. Myrick, 102 Wash.2d [506,] 511 [, 688 P.2d 151 (1984)].
Ladson, 138 Wash.2d at 348-49, 979 P.2d 833 (emphasis added) (footnote and one citation *1066 omitted). "The warrant requirement is especially important under article I, section 7, of the Washington Constitution as it is the warrant which provides the `authority of law' referenced therein." Id. at 350, 979 P.2d 833. See also State v. Parker, 139 Wash.2d 486, 493, 987 P.2d 73 (1999). ("Article I, section 7 provides: `No person shall be disturbed in his private affairs, or his home invaded, without authority of law.'"); Bosteder v. City of Renton, 155 Wash.2d 18, 29, 117 P.3d 316 (2005) (citing City of Seattle v. McCready, 123 Wash.2d 260, 270, 868 P.2d 134 (1994) for the rule that "warrants issued in the absence of statute or court rule authorization `cannot serve as the authority of law for a governmental disturbance of an individual's private affairs'"). State v. Reichenbach, 153 Wash.2d 126, 131, 101 P.3d 80 (2004) ("As a general rule, warrantless searches and seizures are per se unreasonable. However, there are a few `jealously and carefully drawn exceptions' to the warrant requirement, including consent.") (citation omitted) (quoting State v. Hendrickson, 129 Wash.2d 61, 70-71, 917 P.2d 563 (1996)).
¶ 54 But there was no warrant here. Moreover, there is no basis to believe that the Founding Fathers envisioned pretrial discovery initialed by a party opponent "authority of law" since (1) such a procedure did not exist at the time the constitution was ratified and (2) authority of law by its nature must come from a lawful authority, not just any litigant who requests discovery. Sofie, 112 Wash.2d at 645, 771 P.2d 711; see also Mace, 98 Wash.2d at 99, 653 P.2d 618. Accordingly "authority of law" in this context must at least be a court order affirmatively directing discovery, not one just denying a protective order. And at minimum such an affirmative order should not issue absent satisfaction of the Snedigar test.
¶ 55 Both the federal courts and this court have recognized the First Amendment limits civil discovery of information central to associational freedom, such as the membership lists of private associations. See Snedigar, 114 Wash.2d 153, 786 P.2d 781; Black Panther Party v. Smith, 661 F.2d 1243 (D.C.Cir. 1981) (vacated sub nom. Moore v. Black Panther Party, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982) (mootness)). The constitutional right to privacy is not a poor cousin to the First Amendment. It deserves the same level of scrutiny and protection during civil litigation as any other constitutional right.

E. Application of Snedigar
¶ 56 Snedigar sets forth a three-part balancing test to determine whether an asserted First Amendment associational privilege (or in this case an article I, section 7 privacy privilege) would protect information from civil discovery requests.
¶ 57 First, the party asserting the privilege must make an initial showing that there is some probability that the disclosure would impinge on the right. See Snedigar, 114 Wash.2d at 159, 786 P.2d 781.
¶ 58 Second, once that showing of privilege is made, the burden shifts to the party seeking discovery not only to establish the relevance and materiality of the information sought, but also to make a showing that reasonable efforts to obtain the information by other means have been unsuccessful. Id. at 165, 786 P.2d 781. At this second step, "the interest in disclosure will be regarded as relatively weak unless the information goes to the `heart of the matter', or is crucial to the case of litigant seeking discovery." Id. "`Mere speculation that information might be useful will not suffice.'" Id. (quoting Black Panther Party, 661 F.2d at 1268).
¶ 59 Third, if the moving party can establish that the interest in the disclosure goes to the "heart of the matter" or is crucial, then the trial court balances the parties' competing claims of privilege and need, Snedigar, 114 Wash.2d 153, 786 P.2d 781, and only orders disclosure if truly necessary. Although this is ultimately the task of the trial court, that court might consider some of the following factors:

1. Impingement Upon Private Affairs of BSA
¶ 60 Arguably, BSA has a strong institutional interest in protecting the integrity of the ineligible volunteer files system because it depends upon the assurance of confidentiality *1067 given to report sources. If persons with knowledge of abuse believe these files will be revealed containing their reports to BSA, they may be less likely to come forward. See Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1546 (11th Cir.1985). The ability of BSA to assist literally thousands of local community sponsors across the country to avoid appointment of volunteers who do not meet scouting standards may be threatened by the trial court's order. These files are still "private" by nature, even after redactions.

2. Plaintiffs Cannot Satisfy Shifting Burden
¶ 61 If the BSA shows "some harm," the burden then shifts to the plaintiffs "to establish the relevancy and materiality of the information sought, and to make a showing that reasonable efforts to obtain the information by other means have been unsuccessful." Snedigar, 114 Wash.2d at 164, 786 P.2d 781. Regarding relevancy, we cautioned in Snedigar:
[T]he interest in disclosure will be regarded as relatively weak unless the information goes to the "heart of the matter", or is crucial to the case of litigant seeking discovery. As the District of Columbia Circuit Court of Appeals has pointed out:
Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity.

Black Panther Party v. Smith, 661 F.2d 1243, 1268 (D.C.Cir.1981) vacated mem. sub nom. Moore v. Black Panther Party, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982) (mootness).
Id. at 165, 786 P.2d 781 (footnote omitted).
¶ 62 Nor arguably was any evidence offered to establish how the ineligible volunteer files go to the "heart of the matter" or are "crucial" to plaintiffs' case. None of these files has anything to do with the alleged incident which is the subject matter of this claim, nor with the individuals involved. It is collateral at best. Plaintiffs have already obtained 1,900 of some 10,000 ineligible volunteer files and after review cannot offer anything more than speculation that the contents of the remaining ineligible volunteer files might somehow be supportive of their claims. Moreover, the information plaintiffs seek is not discoverable if it may be obtained from other sources. Cf. Hickman v. Taylor, 329 U.S. 495, 513, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (opposing party not entitled to work product when the information is available from other sources). Such an inquiry is therefore appropriate as well.

3. The Trial Court Failed To Balance the Respective Interests
¶ 63 Even treating T.S.'s claims as sufficient to satisfy Snedigar's highly particularized showing requirements, the superior court still must balance plaintiffs' asserted need against the constitutionally protected private affairs "and determine which [was] the strongest." Snedigar, 114 Wash.2d at 166, 786 P.2d 781. But no balancing took place here. An order was issued denying most files protection and compelling production. The failure to balance is itself a manifest abuse of discretion.
¶ 64 The trial court's protective measures  redaction of names  arguably will not insulate an erroneous order to compel. Eugster v. City of Spokane, 121 Wash.App. 799, 809, 91 P.3d 117 (2004), review denied, 153 Wash.2d 1012, 106 P.3d 762 (2005). Eugster affirmed a trial court's order quashing a subpoena duces tecum seeking information protected by the First Amendment. It held production of the documents would have a "potential chilling effect" on the subpoenaed party's First Amendment rights, and a protective order allowing the subpoenaed party to designate documents "confidential" under a protective order would not be enough to overcome this chilling effect. Id.
¶ 65 I would recognize article I, section 7's mandate to protect our private affairs applies to litigation discovery and remand to the trial court to apply the Snedigar test.
¶ 66 Therefore I dissent.
J.M. JOHNSON, J., concurs.
NOTES
[1] Plaintiff K.S. was later added as a party.
[2] For consistency, this opinion will refer to the parties as "plaintiffs" and "BSA," recognizing that T.S., M.S., and K.S. remain plaintiffs at trial, were respondents in the Court of Appeals, and are respondents in this court, while BSA remains a defendant at trial, was appellant below, and is a petitioner before this court.
[3] Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."
[4] BSA recently filed in this court a "Motion to Remedy Violations of Protective Orders" but subsequently withdrew that motion and filed in its stead an "Agreed Motion Concerning Compliance with Protective Orders." The requests made in the "Agreed Motion" are referred to the superior court to be considered as part of that court's further proceedings consistent with this opinion.
[5] While the trial court technically denied BSA's motion (since BSA sought relief from any further production requests concerning the Files), the court's order imposed protective measures, requiring redaction of victims' and perpetrators' names and restricting access to the Files. See above at 6 and below at 10; CP at 669-70.
[6] As to plaintiffs' contention that BSA lacked standing to assert the privacy interests of third parties, we need not determine whether BSA has persuasively shown (1) that it "has suffered an injury-in-fact," (2) that it "has a close relationship to the third party," and (3) that "some hindrance [exists] to the third party's ability to protect his or her own interests." Mearns v. Scharbach, 103 Wash.App. 498, 512, 12 P.3d 1048 (2000). Even if the three factors were to weigh against our recognizing BSA's third-party standing, that would "not necessarily mean ... that such important nonparty rights should not be considered, or that the right to privacy and the right to know should not be weighed, during the discovery process." Alterra Healthcare Corp. v. Estate of Shelley, 827 So.2d 936, 944 (Fla. 2002).
[7] Indeed, the Snedigar opinion neither quotes CR 26 nor refers to CR 26(c), but simply cites CR 26(b)(1) for the preliminary observation that "CR 26 . . . provides that parties may not obtain discovery of privileged information." 114 Wash.2d at 158-59, 786 P.2d 781.
[1] "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.
[2] Compare State v. Smith, 150 Wash.2d 135, 154, 75 P.3d 934 (2003) (no right to prove prior convictions to a jury under habitual offender statute; statute not adopted until 1903, "well after the Washington Constitution was adopted"), with Richmond v. Thompson, 130 Wash.2d 368, 381, 922 P.2d 1343 (1996) (petition clause in article I, section 4 does not limit defamation actions; civil liability for defamation was well established in 1889).